## Commonwealth *v.* Williams, Appellant.

Argued November 23, 1931.  Before FRAZER, C. J., WALLING, SIMPSON, KEPHART, SCHAFFER, MAXEY and DREW, JJ.

*Samuel Moyerman,* for appellant.—Under the Act of May 14, 1925, P. L. 759, giving the jury the right to fix the penalty in a murder case at death or life imprisonment by its verdict, evidence may be offered tending to show the crime resulted from emotional instability and passion rather than from a savage and hopelessly antisocial nature, so that the discretion given by the act may be exercised on a rational basis and not in an arbitrary, capricious, or whimsical manner: Com. v. Parker, 294 Pa. 144, 152; Com. v. Ritter, 13 Pa. D. & C. 285; Com. v. Mellor, 294 Pa. 339; Com. v. Schroeder, 302 Pa. 11; Com. v. Dague, 302 Pa. 13; Com. v. Scott, 14 Pa. D. & C. 191.

A defendant on trial for murder, having entered a plea of not guilty wherein the defense is insanity, after his alienists have testified that he could not distinguish between right and wrong at the time of the act, may show his state of mind, particularly as evidenced by his acts and conduct over the period of time immediately preceding the death, in corroboration of the expert's testimony: Com. v. Buccieri, 153 Pa. 535.

One of the great issues and possibly the real issue in this case was the status of the defendant's mind at the time of the commission of the act in question. Upon it depended the conclusion as to whether a murder had occurred for which defendant was legally responsible: Com. v. Santos, 275 Pa. 515; Mut. Life Ins. v. Hillmon, 145 U. S. 285; Com. v. Rosier, 2 Pa. D. & C. 319; Com. v. Crow, 303 Pa. 91; Com. v. Schroeder, 302 Pa. 1; Com. v. Parker, 294 Pa. 144; Com. v. Mellor, 294 Pa. 339; Com. v. Ferrigan, 44 Pa. 386.

*Charles F. Kelley,* Assistant District Attorney, with him *John Monaghan,* District Attorney, for appellee.— When the accused denies that he committed the act, then the absence of all motive on his part for committing it is a very material fact in his favor; but where it is ad-

mitted or established that he did commit it, the motive is unimportant in determining guilt, unless, as in this case, insanity be set up as a defense, when the absence of any motive which would prompt a sane man to the deed adds to the strength of positive evidence of unsoundness of mind: Com. v. Buccieri, 153 Pa. 535; Specht v. Com., 8 Pa. 312.

In a homicide case, character of deceased is generally irrelevant; his badness cannot excuse the assault upon him: Com. v. Ferrigan, 44 Pa. 386, 388.

Self-serving declarations which are clearly not part of the res gestæ are incompetent, and inadmissible: Hartman v. Ins. Co., 21 Pa. 466; Webber v. Com., 119 Pa. 223.

Defendant complains that his wife was not permitted to testify as to the cause of the depressed condition of her husband and his sudden change. Such information could not be otherwise than hearsay, and, of course, irrelevant and immaterial in this action: Com. v. Gibson, 275 Pa. 338.

A right to a separate trial does not give defendants the right to demand to be tried jointly, and the court in its discretion may order separate trials over an objection that defendants should be tried together: Com. v. Hughes, 11 Phila. 430; Com. v. Kreisher, 79 Pa. Superior Ct. 428.

The Act of May 14, 1925, P. L. 759, does not permit the introduction of irrelevant, immaterial and inadmissible evidence: Com. v. Schroeder, 302 Pa. 1.

OPINION BY MR. JUSTICE KEPHART, January 5, 1932:

The details of the crime for which Harold E. Williams was convicted of murder and sentenced to death are stated quite fully in the preceeding case against Clara Grace Prophet, and need not be repeated except as they are necessary to an understanding of the present case. Williams, when on the stand in his own defense, testified to the agreement to murder Prophet,

in this respect substantiating the confessions introduced against him and Mrs. Prophet. His testimony was as follows: "What I was to do on the first floor was to make this appear as if a burglar had entered the house, to cover up the real reason for this crime. I was to make it appear as though a burglar had entered the house by opening the drawers in the dining room, dumping them out, and I was supposed to take the screen out of the back window and open the back door. In other words, I was to make it look on the first floor as if a burglar had entered and committed the crime, to cover up the real reason, which was the agreement between me and my sister. I was in such a state of mind I had only one object when I entered that house. That was to kill my brother-in-law, and I did." In addition to controverting certain aspects of the confession the defense was insanity when the crime was committed, although he was sane at the trial. The assignments all relate to trial errors, including the alleged error in the rejection of evidence to mitigate the penalty.

Considerable evidence to show circumstances calculated to induce insanity was excluded by the court below. This was manifest error. "As human conditions of every sort are created or influenced by external environment, so too the diseased mental condition which we term insanity may be precipitated, intensified or otherwise affected by external events coming to the apprehension of the person. Accordingly, circumstances calculated to induce this mental condition may always be admitted to evidence the probability of such affectation; the only limitation is that the circumstance be in itself capable in some degree of producing such an effect......and that some further foundation for probability be laid by other evidence that there was a diseased mental condition": Wigmore, Evidence, 2d ed., 483, section 231.

The Commonwealth presented an impregnable case; it showed, by evidence of persons who could not be said

to be hostile or interested, that this homicide was the result of deliberate preparation. Why the chance was taken of a reversal by a protest to evidence which at the time would not have hurt its case materially, may be accounted for by the intense zeal and earnestness to prevent the culprit's escaping punishment. In this, the trial judge overstepped the security guaranteed the accused to a fair trial. As we stated in a case some years ago, it is not wise to rigidly exclude evidence "because its materiality is not clearly obvious." It is better to give the benefit of the doubt to the prisoner in rulings on trivial evidence. "A case such as the Commonwealth so manifestly presented, should not be placed in peril of a reversal by technical rulings on evidence which could not have weakened the Commonwealth's Case": Com. v. Biddle, 200 Pa. 640, 646.

We regret that on account of these errors, such an important trial, costing time, labor, and expense, should end in a failure to accomplish perfect justice. But we cannot escape or shirk the responsibility of securing, as far as we are able, a fair trial which the law of the land gives to every man. The prisoner is entitled to a full, fair and impartial trial, without which no man should suffer the extreme penalty. There is less injury to be done the State by granting a new trial than to the accused by refusing it.

Defendant produced two experts who were eminent in their profession, whose integrity was not in the slightest degree attacked, who testified that at the time the offense was committed, defendant was insane. It formed the basis for the excluded evidence which was to follow. We do not hold that it is first necessary to establish the fact of insanity by other evidence before evidence of acts on the basis of insanity may be considered, though at times a trial court may direct that it be done. The action of the court below in here requiring it was proper under the circumstances.

From the possible answers to the many questions propounded, various material facts might have been revealed. Counsel for defendant asked his sister, Grace Prophet, to relate conversations with him as to Prophet's relations with her, as a circumstance tending to derange his mentality up until the crime was committed. These conversations, relating to the abnormal sexual attacks on her and her son, might have so aroused his anger and passion, so preyed on his weak or even normal mind, and so dethroned his reason, that it became impossible for him to know the difference between right and wrong, and that in this state of mind he killed Prophet. His wife was asked concerning the changed condition of her husband, and the cause of it, and his mother was asked in relation to these same matters.

While the offers or questions were not couched in terms which clearly set forth the purpose of the testimony to be given, yet the questions rejected were such as might well have brought out the scenes which he claimed caused his insane delusion. The evidence was competent for the purpose offered. If the questions were not clear to the court below, it should have required offers which would have brought out the facts to be relied on; but even had there been such offers, it is apparent, from the court's answers in sustaining the objections to the questions, that the offers too would have been rejected.

It is not to be supposed that under a plea of insanity every kind of evidence is to be admitted. It should be evidence of circumstances calculated to cause or induce insanity. In discussing mental capacity, Professor Wigmore says in his work on Evidence, second edition, volume 1, section 228, page 473, that, "The first and fundamental rule, then, will be that *any and all conduct* of the person is admissible in evidence. There is no restriction as to the kind of conduct. There can be none; for if a specific act does not indicate insanity it may indicate sanity. It will certainly throw light

one way or the other upon the issue. 'Upon this I believe that no difference of opinion will be found to exist' (Wright v. Tatham, 5 Cl. & F. 670, 715)." "Such an issue [insanity] opens a wide door for the admission of evidence, as every transaction of the testator's life, every expression he ever used, and his manner of conducting himself on the most ordinary concerns, may have a bearing on the question." Denman, L. C. J., in Doe d. Tatham v. Wright, 6 Nev. & M. 132, 146. In Commonwealth v. Buccieri, 153 Pa. 535, 544, it is pointed out that, though ordinarily motive is inadmissible in determining guilt, it may become important where the defense is insanity; and in other cases evidence, otherwise improper, has been admitted under a defense of insanity: Weber v. Commonwealth, 119 Pa. 223; Commonwealth v. Rosier, 2 Pa. D. & C. 319, charge of the late Judge BARRET. The theory upon which the evidence here proposed may be admitted is shown in People v. Wood, 126 N. Y. 249. Other illustrations may be found in People v. Raizen, 211 N. Y. App. Div. 446, and McCully v. The State, 141 Ark. 451, and State v. Hockett, 70 Iowa 442.

Evidence bearing on defendant's state of mind before, at, and after the commission of the crime, and showing a basis for insanity, is properly admissible on a plea of insanity. While such evidence usually consists of acts, yet statements to others indicating an unsound mind may be received. The hearsay rule forms no objection to the statements to third parties since they are received without reference to the truth of the statement, being merely indicative of a state of mind. While a basis for insanity may be shown followed by evidence of insanity as indicated, there must be limitations as to the character of the evidence to be admitted under this rule. Thus under its guise, evidence unrelated to a state of mind or its cause should not be received. Nor should evidence of inconsequential conversations be admitted as a cause. To allow such evidence would open

the door to the manufacture of testimony which the Commonwealth would have little opportunity to rebut.

The trial court must be the judge of the character and competency of the evidence offered. No rule can be formed which would apply in all cases, each must be considered as the circumstances warrant. If it appears to the trial judge from competent and credible evidence that a mind may have been weakened by sickness, injuries, or previous mental disorders, or that a mind otherwise normal has been subjected to a strain through circumstances that have a tendency to unseat the particular reason in question, the evidence should be received. The court below must exercise its discretion in determining whether the evidence offered would have a tendency to unseat the mind. The evidence should be such that a person of average intelligence would be warranted in believing it would have that tendency; if the individual affected be mentally inferior or subnormal, the test of admissibility is lessened. But, if there is the slightest doubt as to admissibility, it is safer to let the evidence in and prevent possible reversal.

But, of course, we will reverse only when his discretion is shown to be abused. As stated by Wigmore, Evidence, volume 1, page 474: "Moreover, a court on appeal may properly enough refuse a new trial merely for the rejection below [of evidence] of conduct which was not especially significant."

In all these considerations the emotional relation of the various parties involved should be considered, whether through family relationships or otherwise. Here, defendant was shown to be of inferior mentality. His master at school so described him. While he was fairly well educated, the experts did not believe he possessed the mental faculties of an ordinary person. He claimed to have a great love for his sister; that, he says, was sacred. When she related to him the supposed series of indecent practices of her husband, he brooded over his sister's situation, and because of them his reason

may have become so unbalanced that he could not know or be responsible for what he did, or distinguish between right and wrong. If the evidence was true, and we cannot decide this, we can readily see how such a mind might be (we do not say it would be) preyed on to such an extent that reason might flee. The jury was to determine the value of the evidence and should be instructed, that the evidence must show the mind unbalanced to such an extent that the accused did not know the difference between right and wrong while his mind was in its deranged state and at the time the offense was committed.

It was competent to show conduct of the accused subsequent to his acquiring knowledge of his sister's supposed wrong, his appearance and conversations indicative of an unbalanced mind, all tending to show him insane within the legal definition of the term, and at the very time the crime was committed.

It should be made clear in the charge to the jury that such evidence is admissible to show insanity, and for that purpose only, and if the jury finds even with such evidence before them, that the prisoner was sane at the time he did the act, the facts testified to in order to show insanity could in so sense justify or excuse the crime. No motive is sufficient to account for a wilful, deliberate, and premeditated murder where the accused is sane. The jury should be so instructed in no uncertain terms.

We will not discuss the assignments of error in detail. We sustain those which relate to the subjects above considered on the question of insanity. Thus, the reply of the superintendent of Girard College, describing the intellect of defendant as compared with that of other boys in that institution, should have been received. Doctor Gordon should have been allowed to answer the hypothetical question put to him and detail incidents of defendant's life that he relied on for his opinion. The lease should not have been received in evidence, it con-

tained no obligation. There are many other assignments which are not well taken.

No complaint can be made of the remarks of the trial judge throughout the trial; his comments were not out of place or prejudicial. It was clearly within the discretion of the court to refuse a joint trial: See Franklin's App., 163 Pa. 1; Com. v. Kreisher, 79 Pa. Superior Ct. 428; Sadler, Criminal Procedure in Penna., 271; 16 C. J. 785, section 2007.

It may be, as the district attorney urges, the evidence of insanity is a framed defense, and that the murder was a deliberate, cold-blooded murder to get insurance, and to get rid of Mrs. Prophet's husband. But, we cannot view the case from this standpoint. Evidence cannot be rejected because we may think it is framed when defendant brings his case within a legitimate field of inquiry. Courts are powerless to close the door to manufactured testimony. The Commonwealth in such case will be permitted to go far to prove to the jury that the defense is not real, that it is framed, that it has no merit, and that defendant was of normal mind.

The defendant further urges that the court below should have received in evidence, under the Act of May 14, 1925, P. L. 759, authorizing the jury to fix the penalty in homicide cases, testimony that might tend to induce that body to reduce the penalty to life imprisonment; that as the Commonwealth is now permitted to offer a criminal record in aggravation of the penalty, he should be permitted to show specific mitigating circumstances.

Defendant wholly misapprehends the rule permitting the use of criminal records under the Act of 1925, or the circumstances under which they may be admitted. He urges that, under the Act of 1925, the accused may in general be questioned, or evidence may be submitted as to former convictions, to enable the jury to determine properly the penalty to be inflicted. As a general rule, at common law, on a prosecution for a

particular crime, a distinct crime unconnected with that laid in the indictment cannot be given in evidence against a prisoner as substantive proof of the crime for 'hich he is being tried. Nor can evidence of such crin e be received to impeach general character, or to prc /e a normal disposition to commit the crime for which the accused is on trial. All our authorities are in accord on this proposition: Shaffner v. Com., 72 Pa. 60; Goersen v. Com., 99 Pa. 388, 398; Com. v. Wilson, 186 Pa. 1, 23; Com. v. Biddle, supra, at page 647; Com. v. Haines, 257 Pa. 289; Com. v. Coles; 265 Pa. 362; Com. v. Gibson, 275 Pa. 338; Com. v. Shields, 50 Pa. Superior Ct. 1, 21; Com. v. Doe, 79 Pa. Superior Ct. 162; Wharton, Crim. Evidence, (10th edition), section 30; Wigmore, Evidence, (2d edition), volume 2, section 192, volume 2, sections 977-989.

There are, however, many well recognized exceptions where the commission of another offense by the defendant may be received in evidence. Prior convictions can be admitted in evidence to show intent, scienter, motive, identity, plan, or the accused to be one of an organization banded together to commit crimes of the sort charged, or that such prior conviction or criminal act formed a part of a chain, or was one of a sequence of acts, or became part of the history of the event on trial, or was part of the natural development of the facts; also to prove the mental condition when the defense was insanity, or to rebut the inference of mistake, or to show a guilty knowledge: Com. v. Coles, supra; Com. v. Cicere, 282 Pa. 492; Com. v. Dorst, 285 Pa. 232; Com. v. Quaranta, 295 Pa. 264. For these purposes prior convictions or criminal records may be brought out either on cross-examination or by extrinsic testimony: Goersen v. Com., supra; Com. v. Coles, supra; Com. v. Weiss, 284 Pa. 105; Com. v. Ferrigan, 44 Pa. 386; Wharton, Criminal Evidence (10th edition) section 31. In Com. v. Racco, 225 Pa. 113, it was held that where a prisoner takes the stand on his own behalf,

he may be asked on cross-examination, as a test of credibility, whether or not he had been convicted and sent to prison for other offenses, and if his answer is a denial, the facts may be shown by other witnesses. Such witnesses may testify as to the accused's declarations as to the commission of such crimes. At common law generally, prior convictions of certain crimes in the nature of crimen falsi could be used as evidence to effect credibility, either through cross-examination or by the testimony of other witnesses: Com. v. Racco, supra; Com. v. Quaranta, supra, at page 272; Com. v. Doe, supra; Underhill, Criminal Evidence, sections 60 and 61; see also Beck v. Hood, 185 Pa. 32, 38.

The Act of March 15, 1911, P. L. 20, however, provided that a person charged with crime "shall not be asked, and, if asked, shall not be required to answer, any question tending to show that he has committed, or been charged with, or been convicted of any offense other than the one wherewith he shall then be charged, or tending to show that he has been of bad character or reputation" with certain exceptions immaterial here; it was passed to relieve a prisoner from the hardship and the breadth of the rule announced in the Racco Case, that rule being at variance with the law in many states.

But this act extends only to the cross-examination of the accused, as the title and the body of the act specifically applies to such examination. It is "an act regulating in criminal trials the cross-examination of a defendant when testifying in his own behalf," and does not relate to affirmative proof by the Commonwealth already admissible under the exceptions above listed; see cases there cited, also Com. v. Garanchoskie, 251 Pa. 247. Therefore, conduct derogatory to a witness's character for veracity may be proved by showing by other witnesses that he has been convicted of an infamous offense. No collateral issue of fact is thus raised, as the record establishes the fact; only crimes of felony

or a misdemeanor in the nature of crimen falsi are admissible to affect credibility: Com. v. Quaranta, supra.

This was the law when the Act of 1925 above referred to was enacted. That act introduced a new feature in the procedure of homicide trials; it established a new penalty, life imprisonment, and placed on the jury the responsibility of fixing the punishment where a first degree murder was committed. Theretofore conviction of a wilful, deliberate, premeditated murder was followed by the death penalty, and a penalty of life imprisonment or pardon could be secured only through mitigating circumstances in an appeal to the board of pardons. Now when a murder is committed, in speaking of a wilful, deliberate, and premeditated murder, it must be contemplated in terms of both punishments. Does the Act of 1925 open a new field of evidence to the extent here claimed or that might be considered by the pardoning power, or effect a procedural change which would render it necessary for the jury by supplementary verdict to fix the punishment? In at least one state the law permits a supplementary verdict to fix the penalty, this by statute. We held in Com. v. Parker, 294 Pa. 144, that in this State there could be but one verdict which must embrace both findings. We must view the act apart from its wisdom. Obviously, the legislature, in directing the jury to fix the penalty and providing a new penalty, intended that the jury should have some guide in determining which punishment to inflict. But, did the legislature intend that anything more than the circumstances surrounding the homicide then on trial should be considered? This question was answered in the negative by the California court in People v. Witt, 170 Cal. 104, 148 Pac. 928, where under a similar statute the defendant wished to show evidence in mitigation of the sentence for the consideration of the jury; the court there held that the law did not contemplate any such independent inquiry, and that the determination of the jury in fixing the penalty at

life imprisonment or death is to be based solely on the evidence admissible on the issues made by the indictment and the plea of the defendant.

In this State we have gone beyond this and admitted evidence of prior convictions and other offenses in aggravation of the penalty in four cases, Com. v. Parker, supra, Com. v. Mellor, 294 Pa. 339, Com. v. Dague, 302 Pa. 13, and Com. v. Flood, 302 Pa. 190. It is possible that a comparison of these cases with those decided before 1925 where prior convictions were admitted notwithstanding the Act of 1911, would show that all could be sustained under the latter. But we definitely said in Com. v. Parker, supra, and the other cases above cited, that evidence of prior convictions was admissible under the Act of 1925 in aggravation of the penalty. Apart from the fact that the Act of 1925 is silent on the subject, the fundamental objection to the introduction of such evidence is that the jury may be prejudiced by a familiarity with these prior convictions when considering the question of guilt or innocence. We endeavored to relieve this possible difficulty by directing the trial court to explain carefully to the jury the limitation on this evidence. Even so, there can be little doubt that the admission of a prior conviction trenches very strongly on the fundamental rule of evidence, that a distinct crime unconnected with that on trial cannot be given in evidence against a prisoner as proof of the crime on trial; it shows a moral disposition to commit crime. But, as stated in Com. v. Parker, supra, the law must advance to protect society against habitual criminals. In each of the four cases, it has appeared that the accused was in a violent manner an habitual offender against society. In the first three cases the criminal record appeared in confessions, in the last (a hold-up case) the witness was asked a question, the answer to which inevitably brought out a criminal record similar to that for which he was on trial, though the question was not so framed. All the cases referred to

where criminal records or criminal acts were admitted were ones where the prisoner was on trial for an atrocious crime accompanied by violence or where violence was a necessary element, such crimes as makes the offender a grave menace to society, and it appeared that the defendant was an habitual criminal.

In the light of these cases, evidence as to prior convictions to aggravate the penalty must be strictly limited. A first degree verdict is a finding that the accused wilfully, deliberately, and premeditatedly killed his victim. Where the trial judge is convinced that such crime was committed for profit, such as the crimes of highway robbery, burglary, murder for life insurance, bank holdups, and the like, and that the criminals are habitual offenders against society, then prior convictions may properly be received by the jury as an aid in determining the penalty to be inflicted. Where prisoners are known as habitual criminals of the type thus described, who kill for mercenary purposes, the death penalty should be inflicted as a protection to society. It is also possible that there are other kinds of homicide where death is the result of sordid passion, which ought to be followed by the death penalty, where prior convictions could be used. But in no case should a record of such criminal acts such as pickpocketry, adultery, embezzling, perjury, or others of a similar nature be used in aggravation of the penalty.

Thus limited, the jury will have before them the records of professional criminals who war on society for profit, or those who commit crimes of atrocity, and, so limited, we feel that neither the Act of 1911 nor the common law is offended by an unfair use of former convictions. A desperate character should not escape the just consequences of his act as he might otherwise do if the arms of the Commonwealth were fettered by the Act of 1911 or the common law.

As we have given the Commonwealth this opportunity to aggravate the penalty, should defendant be excluded

in all cases from showing mitigating circumstances? He here proposed to show that the crime resulted from passion (not generated at the time the crime was committed), rather than from a savage and hopelessly anti-social nature. The offer was to show a motive for the commission of the crime, or, in other words, to explain what he claims was the real reason why he killed Prophet; to show that Prophet was an ill-tempered, fault-finding degenerate, and that if defendant was not justified in killing Prophet, society was well rid of him and the defendant, his killer, should therefore not receive the sentence of death for his act. The court below refused to receive this evidence.

As indicated above, there is no provision in the Act of 1925 for a verdict to determine, first, the grade or degree of the homicide, and a supplementary verdict, if it be first degree, to fix the penalty, as is the case in some of our sister states. Under our procedure such evidence, if admissible, would have to be considered along with the general body of the evidence from which the guilt or innocence of the accused is to be determined. Such evidence could not be introduced at common law in the trial of the issue under the indictment and if now admissible it becomes so only through the Act of 1925. If any such evidence is to be admitted, to avoid confusion and misleading issues, a supplementary verdict would be highly desirable.

Mitigating circumstances do not constitute justification or an excuse for the offense, but they are such matters as may be submitted in the form of testimony or may be derived by inference from the general body of the evidence which in fairness and mercy may be considered by the jury in fixing the degree of moral culpability by reducing the punishment inflicted. See Smith v. People, 75 Pac. 914, 32 Colo. 251. But the evidence relied on in this case, if we assume it to be true and that defendant was sane when the act was committed, shows the crime to have been done after passion had

subsided, out of a merciless, vindicative spirit toward his victim, with a fully formed purpose to relieve his sister of her distress, and with a conscious intent to kill. He says he had a two-fold motive, one of the motives being to get insurance money. Extenuating circumstances to reduce the degree of the crime, in homicide cases, relate to and are derived from all the circumstances attending the killing properly in evidence. Where punishment is to be inflicted by the jury and they are permitted to consider other matters clearly relevant for the attention of a judge or jury in passing sentence, the acts or circumstances should be such as naturally beget mercy; if, however, they point to or exhibit a mind filled with anger, vindictiveness, and mercenary gain, with a reckless disregard of consequences, a merciless spirit toward its victim, with the selection of time and place as a result of careful preparation, such acts would scarcely be appropriate as calling for mercy in a sentence. If evidence of these circumstances was admitted in the present case, the defendant would be asking the jury to find that though he had a clear understanding of his act, which was, in part at least, to profit from the insurance money, mercy should be extended to him because he was outraged at Prophet, who was a wicked man, and because his sister and the world were well rid of him.

If such evidence as here offered is admitted in mitigation of the penalty, there would be no end to the testimony that might be produced in a homicide case, nor would there be any limit to the collateral issues that the jury might be called upon to consider; the Commonwealth's case under such rule would be in grave danger of being lost sight of. The declarations which defendant might introduce are in many instances self-serving statements made prior to the homicide and might well be considered part of a deliberate attempt to evade responsibility for the crime as established by the Commonwealth's own theory of it. The evidence

here offered should not be received where the testimony in the case shows a crime committed for profit which defendant admits was part of his motive.

. The Act of 1925 cannot be used as a shield to protect men who scorn the laws of society, who murderously prey on it for profit, and who commit acts regardless of consequences for mercenary gain. Such men are not entitled to palliation of their offense by showing that the act was, from their point of view, for a meritorious purpose, the merit being conjured in their own minds and of which they are the sole judge.

Defendant also urges that he wished to show, under the Act of 1925, his motive for the crime. We held in Commonwealth v. Buccieri, supra, at page 544, at a time when only the death penalty was inflicted for first degree murder, that where the Commonwealth has proved a fully formed purpose to kill, "no motive is sufficient to account for a wilful, deliberate, and premeditated murder; hence evidence of motive is immaterial and therefore inadmissible." Defendant argues that this principle should not prevail under the Act of 1925, that after the prisoner is found guilty of murder of the first degree, when the punishment alone is to be determined, the reason given for the rule excluding motive must give way. As stated above in discussing mitigating circumstances, the motive here offered is one of justification or excuse for a crime for profit. The same reason for excluding the evidence in mitigation of the penalty would exclude evidence of motive under the Act of 1925.

What we here decide is that the trial judge who had the parties before him, with full knowledge of all the circumstances and the conduct of the case, did not commit error in excluding the testimony offered in mitigation of the sentence. We do not hold that in a proper case mitigating circumstances in relief of the penalty cannot be shown. It is very largely a matter in the discretion of the trial judge who must exercise sound

judicial judgment. It should be such evidence that in fairness and mercy a jury or a judge should consider it in imposing sentence. If the evidence is admitted, the jury should be clearly instructed as to its purpose and that it must be considered only after a verdict of first degree is found. This conclusion leads the writer to the opinion, as expressed by Professor Wigmore (Wigmore, Evidence, 2d edition, volume 1, section 196, 2b, page 429), that if this court cannot provide for a supplementary verdict, the legislature should.

Judgment reversed with a new venire.