Commonwealth *v.* Cannon, Appellant.

Argued April 23, 1956.   Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Walter T. McGough,* with him *Reed, Smith, Shaw & McClay,* for appellant.

*William Claney Smith,* Assistant District Attorney, with him *Edward C. Boyle,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, June 25, 1956:

Defendant was convicted by a jury of murder in the first degree "with life imprisonment". Defendant's motion for a new trial was denied and after judgment was entered this appeal followed.

The Commonwealth proved that defendant went to Stanley's Grill at about six o'clock on the evening of April 13, 1949, where he remained for several hours drinking beer and occasionally whiskey. At about 9:30 that evening he got into an argument with the bartender who called for Williams, the manager. Williams told Cannon that his drinks were shut off and that he would have to put him out. Cannon was then escorted to the door. Several seconds thereafter he reappeared, approached Williams, and when he was about five feet away pulled a pistol from underneath his coat and fired three shots into Williams' abdomen. Five witnesses testified that they saw the defendant in Stanley's Grill the night of the murder. Two witnesses testified that they saw defendant shoot and kill Williams. Williams made a dying declaration accusing defendant of his murder. Notwithstanding all this testimony, defendant—taking the stand in his own defense—denied that he had done the shooting or that he was in Stanley's Grill on the night in question. He testified that earlier that day he had left Pittsburgh by bus for Chicago after an argument with a girl friend with whom he had been living. He was a fugitive until he was apprehended in Cleveland, Ohio, on May 7, 1953.

Defendant alleges two important reasons for a new trial: (1) It was error to permit the Commonwealth to introduce evidence of defendant's prior conviction of manslaughter, (a) because the crime of manslaughter was not a crime of sordid passion or atrocity and the defendant was not a professional criminal, and (b) because defendant had been pardoned of the offense of manslaughter; and (2) The prosecutor's opening remarks to the jury were so highly prejudicial as to constitute reversible error.

In a trial sur an indictment for murder, the record of a former conviction of unrelated crimes is admissible in evidence, not for the purpose of influencing the jury (or the Court) in determining defendant's guilt or innocence of the crime for which he is being tried, but solely for the limited purpose of aiding the jury (or the Court) in determining the penalty to be imposed, in the event that the defendant is found guilty of murder in the first degree: *Commonwealth v. LaRue,* 381 Pa. 113, 120, 112 A. 2d 362; *Commonwealth v. Lowry,* 374 Pa. 594, 603, 98 A. 2d 733; *Commonwealth v. Simmons,* 361 Pa. 391, 401, 65 A. 2d 353; *Commonwealth v. DePofi,* 362 Pa. 229, 66 A. 2d 649.

Neither reason nor authority limit the admissibility of prior convictions to cases where the defendant was either a professional criminal or his crime was one of sordid passion.

In *Commonwealth v. LaRue,* 381 Pa., supra, the record which was admitted contained a conviction of defendant of only one crime, namely, armed robbery. In *Commonwealth v. Simmons,* 361 Pa., supra, a conviction of a conspiracy, and a conviction of a robbery were admitted in order to aid the jury in its function of fixing the penalty if they found the crime, as they did, to be one of murder in the first degree. In *Commonwealth v. Lowry,* 374 Pa., supra, a conviction of four separate

crimes of larceny was held to be admissible even though the District Attorney asked only life imprisonment. See also: *Commonwealth ex rel. v. Smith*, 324 Pa., infra.

In *Commonwealth v. Turner*, 371 Pa. 417, 88 A. 2d 915, which is relied on by appellant, this Court held that the evidence of prior arrests was not admissible, but evidence of other crimes was admissible when limited "to prior convictions, confessions or admissions". The Court said (page 434) :

"The Act of May 14, 1925, P. L. 759, as interpreted by this Court allows evidence of prior convictions so that '. . . the jury may have before it the past deeds of the accused that it may be fully advised of his nature and deserts when it fixes the penalty . . .': Commonwealth v. Kuruts, 312 Pa. 343, 168 A. 28; Commonwealth v. Dague, 302 Pa. 13, 152 A. 839. . . .

" '. . . The reason for the admission of such evidence was made clear in Commonwealth v. Dague [302 Pa. 13] supra, where we said: ". . . to enable the jury to know what manner of man the defendant was, if they should find him guilty of murder of the first degree, . . ." ' ".

There is no merit in defendant's first contention.

That brings us to the second question involved— Can the Commonwealth offer evidence of a prior crime of which defendant was convicted but pardoned? It is important to note once again that this question arises only in connection with the fixing of a penalty, namely, death or life imprisonment. While the authorities throughout the country are in sharp disagreement as to the effect of a pardon, and while language may be found in some of our cases sufficiently broad to exclude the record of a pardoned crime, Pennsylvania has flatly ruled, at least for the limited purpose here involved, that the record of a prior crime of which defendant has been pardoned is admissible: *Common-*

*wealth ex rel. v. Smith,* 324 Pa. 73, 187 A. 387; *Carlesi v. People of New York,* 233 U.S. 51. Cf. also: *Commonwealth of Quaranta,* 295 Pa. 264, 145 A. 89; *Wolfe's Disbarment,* 288 Pa. 331, 135 A. 732.

In *Commonwealth ex rel. v. Smith,* 324 Pa., supra, a prior conviction of voluntary manslaughter, of which defendant had been pardoned, was held to be admissible for the purpose of determining the sentence to be imposed by the Court for second degree murder. An added penalty or longer sentence was imposed by the Court under and by virtue of §182 of the Act of March 31, 1860, P. L. 382, which provided that a defendant who is a *second offender* may be sentenced for double the time prescribed as punishment for the first offense of the crime for which he is convicted. The Court held that the test as to whether the second offender provision is applicable, is the existence of the fact of prior conviction. The Court said (pages 76, 77) : " 'The pardon of this defendant did not make "a new man" of him; it did not "blot out" the fact or the record of his conviction,* . . . . The pardon in this case merely restored the defendant to his civil rights. If it had been granted before his term of imprisonment had been served, it would also have relieved the defendant of that. *But it did not obliterate the record of his conviction, or blot out the fact that he had been convicted.*** It relieved the defendant of the consequences which the law attached to his offense.' "

In *Burdick v. United States,* 236 U.S. 79, 89, the Court quoted with approval Chief Justice MARSHALL's statement in *United States v. Wilson,* 7 Peters, 150, 160:

---

* I believe it would have been more accurate to have added "unless it was granted because defendant was innocent of the crime of which he was convicted".

** Italics ours.

"A pardon is an act of grace, proceeding from the power entrusted with the execution of the laws, which exempts the individual, on whom it is bestowed, from the punishment the law inflicts for a crime he has committed."

Appellant relies upon a dictum contained in *Commonwealth ex rel. Banks v. Cain,* 345 Pa. 581, 584, 28 A. 2d 897. In that case the Court sustained the constitutionality of the Parole Act, and by way of analogy, said (page 584) : "There is a radical difference between a pardon and a parole. A pardon is the exercise of the sovereign's prerogative of mercy. It completely frees the offender from the control of the state. It not only exempts him from further punishment but relieves him from all the legal disabilities resulting from his conviction. It blots out the very existence of his guilt, so that, in the eye of the law, he is thereafter as innocent as if he had never committed the offense:[*] Diehl v. Rodgers, 169 Pa. 316, 319, 32 A. 424, 425; Commonwealth v. Quaranta, 295 Pa. 264, 273, 145 A. 89, 93; Commonwealth v. House, 10 Pa. Superior Ct. 259, 264, 265."

In *Commonwealth v. Quaranta,* 295 Pa., supra, the Court held that a defendant may be cross-examined

---

[*] A dictum in almost the same language may be found in *Ex Parte Garland,* 71 U.S. 333, and similar sweeping language can be found in *Carlisle v. United States,* 83 U.S. 147; in *Osborn v. United States,* 91 U.S. 474; and in *United States v. Klein,* 80 U.S. 128. However, later cases in the Supreme Court and in the Federal Courts substantially narrow the sweeping generality above mentioned and decidedly limit the effect of a pardon. See: *Carlesi v. People of State of New York,* 233 U.S. 51; *Burdick v. United States,* 236 U.S. 79, 89; *Knote v. United States,* 95 U.S. 149; *Richards v. United States,* 192 F. 2d 602; Williston, 28 Harvard Law Review, Note 7, page 648. See also: Spenser, Federal Cases, No. 13,234, page 922-923; 3 Wigmore, Evidence, §980 (3), §987; numerous cases cited in footnote to *Richards v. United States,* 192 F. 2d, p. 606. See also: "The Effect of a Pardon" by Professor Henry Weihofen, 88 Pennsylvania Law Review, p. 177.

about the conviction of a crime for which he had been pardoned, and said, inter alia: "A pardon is an act of mercy or grace from a governing authority. In effect, it is a remission of guilt, exempting the individual from punishment for the offense. . . . In Diehl v. Rodgers, supra, Mr. Justice MITCHELL states that a person pardoned is restored 'to his civil rights, as though he had never committed the offense'. The question in that case was the competency as a witness of a pardoned criminal [who had been convicted of perjury]. Pardoned offenders are 'thereby rendered competent witnesses . . ., their credit is still to be left to the jury.' He 'was a competent witness (but) his credibility was for the jury' 'if either party had asked that it be submitted.' We hold, in accordance with the preponderant view, that, whenever one who has been pardoned of a crime such as would ordinarily affect credibility, testifies as a defendant in a criminal case, the judgment of conviction may be inquired into, and the issuance of the pardon may also be shown: 20 R.C.L. 567; Curtis v. Cochran, 50 N.H. 242; Dudley v. State, 24 Tex. App. 163; 2 Wigmore on Evidence, 980; 47 L.R.A. (N.S.) 215."

In *Commonwealth v. House,* 10 Pa. Superior Ct. 259, 264, 265, cited in *Commonwealth ex rel. Banks v. Cain,* 345 Pa., supra, the Court discussed the effect of a pardon and pointed out its limitations.

In the instant case, even if evidence of the pardoned crime of manslaughter were inadmissible, its admission would have been harmless error. As the trial Judge clearly and specifically said, it is admissible in evidence, not for the purpose of influencing the jury in a determination of defendant's guilt or innocence, but solely for the limited purpose of aiding the jury in determining the penalty to be imposed, in the event that the defendant was found guilty of murder in the first degree.

The penalty imposed by the jury upon Cannon was not death but life imprisonment; it clearly follows, therefore, that the admission of his prior crime of manslaughter did not affect or influence the jury in the penalty it imposed.

Defendant further contends that a new trial should be granted because during the opening address to the jury the prosecutor said: "This was not the first time that James Cannon took the life of another human being." We have frequently said that a remark by counsel or by the Court must be considered in connection with its context in determining whether it constituted prejudicial and reversible error. The District Attorney was entitled to make an opening statement to the jury outlining the facts he intended to prove: Am. Jur. Trial, §454. In *Commonwealth v. Meyers*, 290 Pa. 573, 139 A. 374, the Court, in rejecting the defendant's contention of prejudicial statements in the District Attorney's opening address to the jury, said: "The statements of counsel, which are based on facts he expects to prove or on legitimate inferences deduced therefrom, do not transcend the bounds of a legitimate opening and are not to be discountenanced by the court. The important question is whether the prosecuting officer's remarks are merely assertions intended to inflame the passions of the jury, or statements that are fair deductions from evidence to be presented."

In *Commonwealth v. Cisneros*, 381 Pa. 447, 113 A. 2d 293, this Court reviewed many far stronger statements made by a District Attorney (than the instant one)—statements which had been held not to be prejudicial, and said (page 451): "In Commonwealth v. Meyers, 290 Pa. 573, 581, 139 A. 374, this Court stated: 'Where, under all the circumstances of the case, the verdict rendered is a just one, the language of the prosecuting officer which will justify a reversal must be such

that its unavoidable effect would be to prejudice the jury . . .' ".

We are of the opinion that while the language excerpted from the opening remarks of the District Attorney as to what the Commonwealth intended to prove was badly chosen, the verdict rendered was obviously a just one, and the Court below was convinced that the language was not intended to be inflammatory, did not have any inflammatory effect, and did not prejudice the jury. We agree with this conclusion and find no reversible error in the record.

Judgment affirmed.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The defendant in this case, James Cannon, was convicted of murder in the first degree in the Court of Oyer and Terminer and General Jail Delivery of Allegheny County. At the trial the Commonwealth introduced, over the defendant's objection, the record of a prior conviction for manslaughter in the State of Maryland even though the defendant had received a full pardon for that offense. The introduction of this record deprived James Cannon of due process of law and entitles him to a new trial. Once a person is pardoned of a crime, that conviction ceases to exist and the Commonwealth has no right to refer to it in derogation of the pardoned man's rights.

In contemplation of law, a pardon "so far blots out the offense, that afterwards it cannot be imputed to him to prevent the assertion of his legal rights. It gives him a new credit and capacity, and rehabilitates him to that extent in his former position" (*Knote v. United States*, 95 U.S. 149), and hence "its effect is to make the offender a new man." (4 Blackstone Com. 402).

Thus, to inform the jury that the accused was once convicted of a heinous offense, when the record shows he was pardoned, is to make him an "old man" again, and cripple him in his trial on the current charge. He is made to drag chains from which the law has already emancipated him. He is made to suffer a punishment which the law has already remitted. To pardon and yet to punish is a blatant contradiction. It is like a parent forgiving his child while chastising him with a strap; or like absolving one's debtor while ordering the sheriff to sell his home; or condoning a neighbor's transgressions while shooting his dog; or wiping a slate clean while immersing it in mire; or letting bygones be bygones while preparing an act of vindictive reprisal.

A pardon represents the most powerful exercise of sovereign power insofar as individuals are concerned. It achieves the magic of turning back time and making non-existent what was once existent. It reconstructs the bridge of honor which was broken; it repairs the wall of credit which had been breached; it replaces over the house of one's good name the roof of good repute which had tumbled.

One of the most authoritative, as well as probably most succinct, definitions of a pardon is contained in Bouvier's Law Dictionary: "An act of grace, usually proceeding from the power intrusted with the execution of the laws, which exempts the individual on whom it is bestowed from the punishment which the law inflicts for a crime he has committed. It is a remission of guilt and a declaration of record by the authorized authority that a particular individual is to be *relieved from the legal consequences of a particular crime.*" (8th Edition, page 2446.)*

---

* Italics throughout, mine.

One of the legal consequences of a crime is that the record of the conviction may be used against the convict in court, but this consequence, like all others, is obliterated by a pardon. In *Osborne v. United States,* 91 U.S. 474, the Supreme Court of the United States said: "It is of the very essence of a pardon that it releases the offender from the consequence of his offence." In *Hoffman v. Carter,* 2 Whart. 453, where the offense of counterfeiting was involved, the Supreme Court said that the consequence of disability as a witness was wiped out by a pardon: "One of the consequences resulting from the sentence was the disability of the party to be sworn as a witness; and when all the sentence is removed together with the consequences of the sentence, except what had been suffered, this disability is removed. It cannot exist separate from the source from which it is derived."

In the case of *Wood v. Fitzgerald,* 3 Oregon 568, it was held that a pardon restores the right to vote to one convicted of arson even though the State constitution itself declared that the right of suffrage shall be forfeited by conviction of any crime punishable by imprisonment in the penitentiary.

Since a pardon then removes all consequences flowing from a conviction, how can the Commonwealth of Pennsylvania inflict upon the defendant, for a manslaughter committed in Maryland, a punishment in addition to that which he has already suffered or expiated? The Commonwealth, on the basis of the Maryland conviction, was attempting to persuade the jury to return a verdict which would visit death upon the defendant. Could there be a graver legal consequence to the Maryland pardoned conviction?

The procedure employed in this trial on the subject under discussion is contrary to the weight of authority as well as to every concept of fairness, humanity, and

the most advanced views on criminology and criminal rehabilitation. At common law the consequences following a conviction for felony were not limited to fines and penal servitude. They included disqualification to vote, to be a juror, to hold public office, to serve in any position of honor and public trust, to enlist in the armed forces of the nation. As the convict left prison behind him, he entered a world with walls of ostracism which confined him as much as did the blocks of stone and the bars of iron which he just quitted. Spurned in public, rebuffed in private, he was physically alive but civilly dead, he moved about in a civil coffin, he wore the shroud of honor's death. A pardon, however, could pump life back into his desiccated veins and make him a living free man again, for a pardon removed "not only the punishment but the legal disabilities consequent on the crime." (2 Russell on Crimes 275; 7 Bacon's Abrid., title Pardon.)

If a pardon then removes all disabilities, why would it not wipe out that one which makes the conviction a basis for the death penalty on a subsequent charge for murder? Does a pardon prohibit all punishment but the most serious one of all?

The law is reputed to be without feeling or compassion and yet no legal act can be truly accepted as a manifestation of justice unless it appeals to one's finer sensibilities, as well as to one's cold intellect. This concept was exceedingly well expressed by Federal Judge ERSKINE in the case of *United States v. Athens Armory*, 24 Fed. Cases 878, 885, where he said: "Although laws are not framed on principles of compassion for guilt; yet when Mercy, in her divine tenderness, bestows on the transgressor the boon of forgiveness, Justice will pause, and, forgetting the offense, bid the pardoned man to go in peace."

In all the iniquitous conduct which the criminal law exposes, the institution of the pardon comes like an angel to reveal the better part of human nature and to demonstrate that man, who is intrinsically good, may, despite all stumblings in the past, walk erectly in the presence of the Lord's, as well as his fellow-man's forgiveness.

And then, it is not to be assumed that a pardon invariably implies forgiveness for a crime actually committed. A pardon may be granted because of proof that justice went astray. On this subject, Justice MITCHELL of this Court, in 1895, in a case which will be referred to later, said that the pardoning power is "an adjunct to the administration of justice, recognized in all civilized governments as necessary *by reason of the fallibility of human laws and human tribunals.*"

If, in fact, the defendant was pardoned because he was innocent of the crime for which he was convicted, is it not monstrous to allow that conviction to be shown nonetheless on a later charge of murder? Is not a pardon in such a situation in effect a judicial acquittal? For whatever reason a pardon is granted, it can come only after a stipulated constitutional procedure has been followed. Why should it be subject to collateral attack any more than a jury's verdict of acquittal?

The position of the Majority in the case at bar is at odds not only with the weight of authority in the nation but with pronouncements of this very Court. As recently as November 23, 1942, in the case of *Commonwealth ex rel. Banks v. Cain,* 345 Pa. 581, 584, Justice HORACE STERN, now Chief Justice, said: "A pardon is the exercise of the sovereign's prerogative of mercy. It completely frees the offender from the control of the state. It not only exempts him from further punishment but relieves him from all the legal disabilities resulting from his conviction. *It blots out the very exist-*

*ence of his guilt, so that, in the eye of the law, he is thereafter as innocent as if he had never committed the offense.*" Today the Majority of this Court says that the pardon does *not* blot out the existence of guilt and that in the eyes of the law the pardoned man is not as innocent as if he had never committed the offense. The Majority explains its refusal to abide by what this Court proclaimed in 1942 by saying that the Chief Justice's utterance in 1942 was dictum. It may be regarded as dictum but I cannot believe that so solemn, measured and profound an utterance was thrown into an opinion as mere literary garniture. Furthermore, this specific language was not used for the first time in the *Banks* case. As far back as 1866, Mr. Justice FIELD of the United States Supreme Court used practically the same phraseology in the famous case of *ex parte Garland*, 71 U.S. 333.

In that cause, the petitioner A. H. Garland, who had served the Confederacy during the Civil War, was pardoned by the President of the United States "for all offenses by him committed, arising from participation, direct or implied, in the Rebellion." When, later, Garland applied to be readmitted to practice before the Federal Courts, it was demanded of him, under a Rule of Court and an Act of Congress, that he take an oath to the effect that he had never given aid to any power hostile to the United States, This, of course, he was unable to do because he had actually participated in the Rebellion. The Supreme Court of the United States held that the effect of Garland's pardon was to relieve him from all penalties and disabilities attached to the offence of treason committed by his participation in the Rebellion and that it was beyond the power of Congress to inflict punishment beyond the reach of executive clemency. Speaking for the Court, Justice FIELD said: "A pardon reaches both the punishment pre-

scribed for the offence and the guilt of the offender; and when the pardon is full, it releases the punishment and *blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence.* If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity."

If a presidential pardon makes of the convicted person a new man so far as a Federal offense is concerned, a gubernatorial pardon does no less where a crime against the State is involved. The question of pardons came before this Court in 1895 in the case of *Diehl v. Rodgers,* 169 Pa. 316, where it was contended that a certain Robert H. Lindsay was disqualified from testifying in an Orphans' Court case because he had once been convicted of perjury, even though he was later pardoned. The lower Court allowed the testimony and this Court approved, Justice MITCHELL saying for the Court: "The act of 1860 says the person convicted of perjury 'shall be forever disqualified from being a witness in any matter in controversy,' but it also says he shall be fined and imprisoned. Both are statutory consequences of the conviction, and the remission of one is no more a violation of the statute than the remission of the other. The statute does not say in either case, 'unless he shall be pardoned,' because the legislature in enacting the statute was not contemplating the exceptional case of a pardon, nor considering its effect on any part of the act. The word 'forever' was introduced in the disqualification not with any reference to the effect of a pardon, but to show that it was not merely to run with the term of imprisonment, and to concur with the exception of

the case of perjury in section 181 of the same act, providing that the endurance of the punishment shall have the effect of a pardon. The result of the two sections read together is that nothing shall remove the disqualification except a pardon . . ."

Further: "Even if this were less clear than it is as a matter of statutory construction, the argument ab inconvenienti would be very strong. Suppose Lindsay was the only witness to a murder, must justice be baffled because of his disability? And yet how is it to be removed if not by a pardon?"

From time immemorial a pardon has always been regarded as the complete and unequivocal restoration of a man's rights which have been lost or damaged in an encounter with the law. A pardon strips from a convict the striped apparel of infamy and shame and clothes him in the suit of innocence and integrity. It opens to him every gate and door in society which had closed on him at the time of conviction. It guards him from scurrility and evil tongues and places in his hand a writ against those who would still call him felon.* If the meanest scoundrel may not designate him a felon, on what basis of authority may representatives of the Commonwealth (which is the symbol of the law) brand him with a criminality which the sovereign power has already washed away? United States Judge ERSKINE well epitomized the results of a pardon when he said that: "Its effect . . . is to obliterate every stain which the law attached to the offender, to place him where he stood before he committed the pardoned offense, and to free him from the penalties and forfeitures to which the law had subjected his person and property:—'to acquit him' says Sir William Blackstone, 'of all cor-

---

* Sharswood's Blackstone, Vol. 2, p. 402.

poral penalties and forfeitures annexed to the offence for which he obtains his pardon.' 4 Com. 402."**

Treating with scant attention what this Court so emphatically pronounced in 1942, the Majority goes back to 1936 and cites the case of *Commonwealth ex rel. v. Smith,* 324 Pa. 73, quoting language which might seem to be the language of this Court. In point of fact, however, the quotation in question is not something written by any member of this Court. It is language taken from a decision in New York State (*People v. Carlesi,* 154 App. Div. 481). Even if this New York case were an expression of New York's highest Court, which it is not, it would still not be binding on us. However, aside from its lack of authority, the language employed in the opinion in the New York case is more argumentative than convincing, more sophistical than persuasive, more an exercise in superficial debating than a demonstration of legal substance. It says that the pardon granted the defendant in that case "did not obliterate the record of his conviction, or blot out the fact that he had been convicted." If the New York Court means to say that the Governor of New York, at the time he granted the pardon, did not actually go to the Court records and with the chemicals of an ink eraser physically obliterate the records of the conviction, the Court speaks correctly, but if it means to say that a superseding, authoritative, and superior action of constitutional government does not blot out (in the sensible meaning of the phrase) the effect of the repudiated and overruled action, the Court is simply indulging in fanciful semantics. According to that type of reasoning, the official hangman ought to proceed to hang a defendant if a jury's verdict is so recorded even though the appellate court reverses the verdict but no

---

** *United States v. The Athens Armory,* supra, p. 362.

one actually blots out with ink, chemicals, knife, or explosive the words of the verdict in the record book of the Court. According to that type of reasoning, a patient recovered from a hospital may never be declared cured until some one destroys his fever chart. Without quoting Omar Khayyam, the New York Court apparently is of the impression that once the moving finger writes, nothing can blot out what it writes. It overlooks the salient reality that the finger of another person, possessed of greater wisdom or at least more enlightenment in the matter, may also write, rendering innocuous and insipid what the first finger wrote.*

The Majority suggests, by quoting from the case of *Commonwealth v. Quaranta,* 295 Pa. 264, that where a defendant has a prior conviction on which he has been pardoned, "the judgment of conviction may be inquired into and the issuance of a pardon may also be shown." To allow a jury to pass upon a previous conviction and pardon would be an intolerable procedure. It would mean that in the midst of a trial on a current charge, the jury would be called upon to deliberate on issues decided in a trial of the past and now already *res adjudicata.* It would mean that the present jury would try not only the present defendant, but all those who participated in the previous conviction and pardon, that is, the jury, the lawyers, the judge, and the governor!

---

* Under the decree of a paternal command, even though posthumously rendered, Hamlet found no difficulty in blotting out records of the past:
"From the table of my memory
I'll wipe away all trivial fond records,
All saws of books, all forms, all pressures past,
That youth and observation copied there;
And thy commandment all alone shall live
Within the book and volume of my brain,
Unmix'd with baser matter." (Act I, sc. IV.)

80

One of the primary objectives of court procedure is to bring a legal conflict to a definitive end. Once the processes of government in any given criminal case have been exhausted and a pardon has terminated the turbulent episode, the books on the subject should be closed and laid away on the shelf to gather the dust of oblivion. Indeed the word *amnesty* a synonym of the word *pardon,* comes from the Greek, *amnestia,* meaning oblivion, the state of condition of being forgotten, no longer remembered.\*

After arguing that the lower Court was justified in permitting the record of the Maryland conviction, the Majority says in its opinion that even if inadmissible the evidence did not harm the defendant because the jury returned a verdict of first degree murder with life imprisonment, and not death. This is a rather academic view. It presupposes that a jury classifies and labels evidence with all the technical nicety of a post-graduate student preparing a thesis. A jury does not appraise testimony in that fashion; it takes no notes. It listens as any twelve average intelligent citizens would listen and reacts with the human impulses common to mankind. Though the Judge instructs that the jury is not to consider the previous conviction except in connection with their deliberation on the matter of first degree penalty, the jury will never be able to dismiss from their minds the fact that the defendant has already manifested an inclination toward grave crime. Thus they will, even unconsciously, allow that item of evidence to influence them in their deliberation on the issue of guilt in the current case.

The jurors could also have been influenced along this line by the remark of the District Attorney at the very beginning of the trial when he said: "This was not

---

\* *Ex parte Garland,* 71 U.S. 348.

the first time that James Cannon took the life of another human being." To brand a defendant as an already established killer prior to the killing which is the subject of the trial is reprehensible, because in effect it requires him to defend two killings although only indicted on one. Such a remark portrays the accused as one indifferent to the sanctity of human life, although by law he is presumed to be innocent until proved guilty.

One of the cardinal rules of American trials is that a man on trial shall be required to answer only the charges on which he stands indicted. The fact that he may have slipped in a puddle of water today does not prove that he may not walk dry shod tomorrow. Chief Justice STERN well put it when he said in the case of *Commonwealth v. Burdell*, 380 Pa. 43, 47 : "One of our most fundamental and prized principles in the administration of criminal law is that a distinct crime, except under certain special circumstances, cannot be given in evidence against a defendant who is being tried for another crime. This is because the fact that a person has committed one offense is not proof that he has committed another and because the effect of such testimony upon a jury is nevertheless bound to create prejudice and an emotional reaction on their part against the defendant."

Chief Justice MAXEY expressed the same principle of law in the case of *Commonwealth v. DePofi*, 362 Pa. 229 : "At common law, evidence of the commission of a distinct crime was not admissible in the absence of a connection between the two crimes. This is still the law in Pennsylvania. This Court said in Commonwealth v. Williams, 307 Pa. 134, 151 (1932), 160 A. 602 : 'There can be little doubt that the admission of a prior conviction trenches very strongly on the fundamental rule of evidence that a distinct crime uncon-

nected with that on trial cannot be given in evidence against a prisoner as proof of the crime on trial.' "

The Majority ends its Opinion with the statement that despite the District Attorney's "badly chosen" remarks, "the verdict rendered was obviously a just one." I have no way of knowing whether the verdict was a just one or not, except from the record. From that record I would say that the defendant did not receive the fair trial to which he was entitled under the Constitution and the laws of this Commonwealth and the decisions of this Court. Therefore, the verdict remains tainted. Therefore, I would grant a new trial. Since the Majority refuses to do this, I, therefore dissent.

Mr. Justice JONES joins in this dissenting opinion.