Commonwealth *v.* Savor, Appellant.

Submitted September 26, 1956. Before STERN, C. J.,
JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Peter Savor,* appellant, in propria persona.

*Edward C. Boyle,* District Attorney, and *William
Claney Smith,* Assistant District Attorney, for appellee.

OPINION PER CURIAM, November 12, 1956:
Affirmed on the opinion of the Superior Court of
Pennsylvania as reported in 180 Pa. Superior Ct. 469,
119 A. 2d 849.

———————

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:
I approach the writing of this Dissenting Opinion
with some weariness because it seems incredible that
this Court could affirm a criminal conviction resulting
from a trial tainted with so palpably flagrant an error,
as the one which will quickly be related. I am unhappy
also that the Superior Court would seem to have with-

drawn from the position it has so staunchly defended in the past, namely, that a defendant may not be compelled to meet a charge of which he has no notice and which is irrelevant to the offense on which he is presently being tried. I further regret that the Majority Opinion in the Superior Court should have been written by a jurist who commands admiration and respect for his ability, learning, and deep sense of fairness, but who in this case arrives at a conclusion which may in the future be used as authority to support unfairness and injustice.

The defendant in this case, Peter Savor, was indicted for armed robbery. At his trial in the Court of Oyer and Terminer in Allegheny County a Commonwealth witness, Joseph Reese, was asked: "How long have you known Mr. Clegg [a co-defendant] and Mr. Savor?" Reese replied: "Well, I met Mr. Savor in 1943 in Western State Penitentiary . . ."

The trial judge, instead of at once declaring a mistrial, allowed the assistant district attorney representing the prosecution to emphasize the outrageously improper statement by a second question which was in reality an affirmation, namely, "You met Mr. Savor in 1943 in the Western State Penitentiary?"

At this point, Savor's lawyer interposed: "Your Honor, I object to the answers being given by the witness, as being prejudicial to the defendant."

The trial judge sustained the objection and said: "Yes, we will sustain that objection, and strike so much of the statement from the record as indicates that the defendant, Savor, had been in the Western Penitentiary. We tell the jury to disregard that because that might be construed by you as evidence of a conviction of some former crime, and that should not be any evidence that tells against the defendant, Savor, in the trial of this case. I ask you to take that from your mind."

It will be noted that the Judge did not dispute the statement that Peter Savor had served time in the penitentiary. He did not say that there was no evidence that Savor had previously committed another crime. In fact he practically confirmed Reese's revelation with the remark that there should be stricken from the record the statement that indicated Savor *"had been in the Western Penitentiary."* * After thus riveting the crippling charge to the defendant's shield of innocence the Judge asked the jury to unrivet it. He was asking for the impossible. The Judge's instruction in this respect, while of course spoken in good faith, was as futile as Macbeth's plea to Lady Macbeth's doctor that he pluck from her memory "a rooted sorrow" and "raze out the written troubles of the brain." How could the jury raze from its mind the startling information it had just heard that the defendant was a proved criminal, an outcast from society, a penitentiary graduate? And what chance did Savor have of proving innocence when it became known at the very outset of his trial that he had already committed an offense of such gravity that he had been committed, not to a house of correction, not to a jail or a workhouse, but to the penitentiary, the ultimate asylum of the wicked and the depraved?

The Majority of this Court has not offered a written explanation of its decision and from that omission rises the cumulus of further regret, because it would be quite interesting, and perhaps illuminating, to ascertain how the Majority can reconcile its decision of today with what this Court unanimously proclaimed as recently as January 3, 1955, in the case of *Commonwealth v. Burdell*, 380 Pa. 43, where, speaking through the present Chief Justice, it said: "One of our most fundamental

---

* Italics throughout, mine.

and prized principles in the administration of criminal law is that a distinct crime, except under certain special circumstances, cannot be given in evidence against a defendant who is being tried·for another crime. This is because *the fact that a person has committed one offense is not proof that he has committed another and because the effect of such testimony upon a jury is nevertheless bound to create prejudice and an emotional reaction on their part against the defendant.*"

The Chief Justice said further: "This is all so well established that it would be but a work of supererogation to point out the many authorites enunciating these principles; merely as examples may be cited the discussions in such characteristic cases as . . ." and then followed a list of eight cases. But it would not be a work of supererogation for the Chief Justice, and those of this Court who refuse a new trial in this case, to explain how the principle in this case differs from the principle which was so wisely, so emphatically, and so unequivocally announced in the *Burdell* case and the eight cases which the Chief Justice enumerated in his excellent Opinion.

The first one of those eight cases cited by the Chief Justice is the landmark of *Shaffner v. Commonwealth,* 72 Pa. 60, where Justice AGNEW of this Court said: "It is not proper to raise a presumption of guilt, on the ground, that having committed one crime, the depravity it exhibits makes it likely he would commit another. Logically, the commission of an independent offence is not proof, in itself, of the commission of another crime. Yet it cannot be said to be without influence on the mind, for certainly, if one be shown to be guilty of another crime equally heinous, it will prompt a more ready belief, that he might have committed the one with which he is charged; *it therefore predisposes the mind of the*

*juror to believe the prisoner guilty.* To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor. . . Without this obvious connection, it is not only unjust to the prisoner to compel him to acquit himself of two offences instead of one, but *it is detrimental to justice to burthen a trial with multiplied issues that tend to confuse and mislead the jury. The most guilty criminal may be innocent of other offences charged against him, of which, if fairly tried, he might acquit himself."*

Not only has this Court categorically condemned the practice of permitting testimony on an independent crime, but the Superior Court has on numerous occasions branded much testimony as "incompetent and highly prejudicial." In the case of *Commonwealth v. Blose,* 160 Pa. Superior Ct. 165, a Commonwealth witness was asked whether the photograph he had looked at was an exact likeness of the defendant. The witness replied: "He is a little better looking now, because it was a penitentiary photograph." Defense counsel objected and moved for the withdrawal of a juror. The motion was refused and the trial court, as here, instructed the jury to disregard the testimony. The Superior Court, however, in reversing the conviction ruled that the error could not be remedied by an instruction to the jury: "The only inference which could be drawn from the testimony was that appellant was a former convict. *It was incompetent and highly prejudicial testimony. . .* The testimony must have left a deep and lasting impression of truth, and . . . we cannot confidently assert that the instructions wholly abstracted it from the interplay of impressions and convictions which generated the jury's ultimate conclusion. . . It is not an unwarrantable assumption that it [the jury] experienced trouble in arriving at a conclusion, and we cannot be certain

that appellant's criminal record was not placed in the scales in the formation of the ultimate judgment. .. The court should have withdrawn a juror, and the error was not cured by its instructions."

If a new trial was in order in that case, and, of course, it was, how much more was it demanded in the case at bar. In the *Blose* case the witness was a State police officer who had aided in apprehending the defendant, but who had had no association with the defendant. In the instant case the witness was a former convict himself who had served in the penitentiary with the defendant, and, in addition was a self-asserted accomplice of the accused in the perpetration of the very crime which was the subject of the trial. It would be difficult to conjure up a situation where a statement of the kind made could do more unfair damage against an accused.

The Superior Court has rendered many decisions in reproof of what has been done in this case, even where the accusing remark was not so destructive as it was here. As recently as September 28, 1955 (*Com. v. Boulden,* 179 Pa. Superior Ct. 328), in a learned and exhaustive opinion on the subject, Judge Woodside said: "The general rule is that 'on a prosecution for a particular crime, evidence which shows or tends to show that accused has committed another crime wholly independent of, and unconnected with, that for which he is on trial, even though it is a crime of the same sort, is irrelevant and inadmissible. . . . The reason for the general rule was stated by Judge, later Chief Justice, KEPHART, in Commonwealth v. Dumber, 69 Pa. Superior Ct. 196, 200 (1918), as follows: "It is not proper to raise a presumption of guilt, on the ground, that having committed one crime, the depravity it exhibits makes it likely he would commit another . . . The objection to this

sort of evidence is that it compels the defendant to meet a charge of which he had no notice. It confuses him in his defense, raises collateral issues, diverts the attention of the jury from the crime immediately being tried, and generally shows that the defendant should be convicted because he is a bad man.' "

In his opinion Judge WOODSIDE cited nearly 50 cases, and said of them: "In practically every case cited in this opinion it has been said in one form or another that evidence of a crime independent and distinct from the one charged cannot be received to prove a disposition to commit crime."

Whether the testimony is purposefully introduced to show disposition to commit crime or whether it is introduced without design but tends to prove the commission of another crime, the evidence is equally incompetent. It will be recalled that in the *Blose* case (supra), the statement with regard to the photograph was made more or less accidentally and without specifc intention to prejudice the defendant's case, but the Superior Court reversed, because pernicious statements which get into the stream of the trial cannot be strained out like tea leaves in a tea pot.

The Commonwealth argues that a new trial is not required even where a statement is prejudicial, if "a witness blurts out a statement which implies that the defendant has a criminal record." But what is the relevancy of such an observation? The question is not *how* and *why* a statement was made but as to what effect it has on the fairness of the trial. Whether an aggressor draws his knife stealthily, or whips it from its sheath noisily, has no bearing on the degree of the criminality involved if the knife actually destroys the victim.

The Commonwealth argues that the test as to whether a new trial is required in a situation of this kind, is

to determine whether the jury was or was not influenced by the accusing statement, neatly summing up this argument with the hand-dusting finality that: If "the unfortunate expression, voluntarily made, had not substantial influence, the new trial should be refused." But the remark being what it is, how can it ever be said that it had no substantial influence? An unrestrained accusation from the witness stand may so mutilate the fabric of a fair trial that no judicial stitching can render it whole again. Suppose a defendant is on trial for the possession of narcotics, and a witness declares that he met the accused in a opium den, how can it ever be said that such a remark did not influence the jury? An accused's character can be so stained by a degrading slur from the witness chair that no mere words from the bench can wash away the blemish so that the accused may stand before his judges, as he is constitutionally entitled to stand, presumed innocent until proved guilty of the crime charged in the indictment.

In his distinguished opinion in the *Boulden* case (supra), Judge WOODSIDE quotes the master on the Law of Evidence, Professor Wigmore, as follows: " 'it cannot be argued: "Because A did an act X last year, therefore he probably did the act X as now charged." Human action being infinitely varied, there is no adequate probative connection between the two. A may do the act once and may never do it again; and not only may he not do it again, but it is no degree probable that he will do it again. The conceivable contingencies that may intervene are too numerous. . . The natural and inevitable tendency of the tribunal whether judge or jury is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present

charge. Moreover, the use of alleged particular acts ranging over the entire period of the defendant's life makes it impossible for him to be prepared to refute the charge, any or all of which may be mere fabrications . . .' "

The Majority apparently seems to be of the thought that, admitting all what Professor Wigmore says is true and what so many of this Court's decisions have declared, to be true also, namely, that evidence of an independent crime may not be introduced, no harm was done in the instant case because the defendant was guilty anyhow. But how is a defendant proved guilty in an American court of law? Not on supposition and not on illegal evidence. The Majority affirms the proposition: "In the case at bar, we are satisfied from our review of the record that appellant received a thoroughly fair trial and was properly convicted. Indeed a verdict of not guilty would have been a miscarriage of justice." We presume that in reaching this conclusion the Majority excluded the damaging remark of the witness Reese. That being so, it can be assumed, arguendo, that a new trial would have again worked a conviction of the defendant. Would it not have been infinitely preferable to have a conviction based only on legal evidence rather than one which can be questioned from now until Doomsday? It has always been the proud boast of our American way of life, and justifiably so, that every defendant, no matter of what he is accused, and no matter what may be the temper of the surrounding community, is entitled to, and will receive a fair trial, with the introduction against him only of evidence which is sanctioned by established law. Even if a defendant has confessed a hundred times to an alleged crime, he may not be brought to trial with a rope around his neck.

The trial in this case lasted but several hours. The cost of a new trial would have been negligible. But as it stands now, the cost to the cause of justice is incalculably high. This Court has laid down a precedent which will embarrass professors of law, confuse students of law, and perplex attorneys-at-law in preparation for trial. Will they now be required to review the whole landscape of an accused's life, and be ready to explain every incident which rises above the static level of a normal man's existence? And having prepared to defend against the multitudinous arrows which can be shot from the bow of defamation, all irrelevant to the indictment, will the Court permit such defense evidence? And how will trial judges in the future instruct juries how to drain from their memories what has been poured into their ears through amplified funnels of accusation?

How many innocent persons in the future will be convicted because of the ruling made here today? How many guiltless defendants in the days and years to come will be branded criminals because of the refusal of this Court to grant a new trial, just because it believes the accused to be guilty—anyhow? A lighthouse, which in the past has saved life and liberty, is being translocated. Whereas heretofore its beams lighted up the dangerous shoals to be avoided, it now has been moved so that it will cast shadows over reefs of disaster and throw blankets of obscurity over rocks, ever lurking to shipwreck truth, honor, and justice. And all this has been done to convict a wretch who, regardless of his past, was entitled to a trial untainted by a type of testimony which has been condemned, denounced, outlawed, and proscribed so many times and over so many decades that one would think it could never again become a subject for controversial discussion.

Although the action of the Majority makes its decision stare decisis, I do not lose hope that the day will come when it will mean what it said only a year and a half ago, namely, *"One of our most fundamental and prized principles in the administration of criminal law is that a distinct crime, except under certain special circumstances, cannot be given in evidence against a defendant who is being tried for another crime. This is because the fact that a person has committed one offense is not proof that he has committed another and because the effect of such testimony upon a jury is nevertheless bound to create prejudice and an emotional reaction on their part against the defendant."*

In the meantime, I dissent.