## Commonwealth *v.* Coleman, Appellant.

Argued November 14, 1955. Before STERN, C. J., STEARNE, JONES, BELL, MUSMANNO and ARNOLD, JJ.

*I. Raymond Kremer*, with him *Morton Witkin* and *Witkin & Egan*, for appellant.

*Victor Wright*, Assistant District Attorney, with him *Vincent G. Panati*, First Assistant District Attorney and *Samuel Dash*, District Attorney, for appellee.

OPINION PER CURIAM, January 5, 1956:

The judgment of the Superior Court is affirmed on the opinion of Judge ERVIN, reported in 179 Pa. Superior Ct. 1.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

I would grant a new trial in this case for any one of three reasons: (1) Two strangers had dinner with the jury; (2) The trial assistant district attorney, with evidence in the case that the defendant was a Republican ward leader, charged that the Republicans had misruled Philadelphia for 69 years; (3) The assistant district attorney told the jury that he could not call certain witnesses because of fear they might possibly be

murdered, presumably by the defendants, of whom the appellant here was one.

1. *Two strangers dined with the jury.*

When it appears to the trial judge that a trial may be unduly protracted, he may, under the Act of May 1, 1935, P. L. 127, 17 P.S. §1153, allow the selection of two additional jurors "who shall be seated near the jury," to take the place of one or two who may die or become incapacitated. The Act is to cover only such emergencies as may arise during the trial, so that if no substitution occurs within that time, the alternates "shall be discharged upon the final submission of the case to the jury." The Act also specifically states that the alternates *"shall not retire with the jury of twelve after the case is submitted to it."*\*

In the case at bar, two additional jurors were chosen and attended upon the trial until the last day, March 24, 1954. At 6:45 p.m. on that day the Trial Judge completed his instructions to the jury without having had to use the two alternates. It became his duty, then, at that moment, to discharge the alternates, as the Act mandatorily directs. From that instant the alternates had no more right to sit with the jury than did the spectators in the courtroom. The two alternates in this case never really formed part of the jury. They were, as it were, vice-jurors, and could not function as jurors any more than vice-presidents or lieutenant-governors may act in an executive capacity unless their principals die or are disabled.

It needs no citation of authority to show that a case is "submitted" to the jury when the Judge completes his charge. The Judge, therefore, properly declared at the termination of his instructions that the services of the two alternates "will no longer be required on

---

\* All italics, mine.

this jury." At this point the two alternates were no more privileged to participate in the trial than plumbers have the prerogative to remain to dine and socialize with the family after they have completed the repair work for which they were called. But the learned Trial Judge here, instead of thanking and bidding the alternates good-night and good-bye, as he should have done, invited them—unquestionably in a spirit of hospitality, cordiality and good nature—to have dinner with the jury. This was error. He then compounded the error by adding that: "I am certain that they [the alternates] will be interested in the outcome that will be arrived at by their colleagues in the jury box." As a matter of reality, the original twelve were no longer colleagues of the two alternates. With the ending of the trial, the law intends that the jury shall disappear behind a curtain which is to be impenetrable not only to alternates but to the entire world as well. By declaring that the alternates would "be interested in the outcome," the Judge suggested, unintentionally of course, that the alternates had a *right* to have that interest satisfied. But, so far as the law is concerned, the interest of the alternates could arise no higher than the general curiosity of the public, of which they were now an intermingled part. The fact that the Judge said: "Do not discuss the case until you retire to the jury room" did not scrape off the patina of authority which covered his declaration that the alternates were "interested in the outcome."

Did the two alternates take advantage of the fraternization with the twelve at dinner to ascertain what that outcome was to be? The record does not state how long the dinner lasted but it does not seem that the overall deliberations of the jury were very lengthy since the verdict was returned at 11 p.m. Nor was there any formal truncation of the association between

the alternates and the jurors. The alternates were authorized to go to dinner with the jurors, but no one in authority supervised the dinner, and no one specified the time that the alternates were to depart. This obviously was a very loose manner in which to handle a vital matter which concerned the liberty of a person on trial.

What happened at the dinner? For eight days the two alternates had associated with the jury. In eight days a very friendly relationship can and does usually develop among Americans who are engaged in a common enterprise, somewhat detached from the rest of the workaday world. Can it be said, in view of this type of camaraderie, that on the last day, as the fourteen sat at the friendly dinner table, they all sealed their lips on the subject which had been their constant source of profound interest for the preceding eight days?

Knowing human nature as we do, can it be said that as the fourteen companions buttered their bread, salted their soup, ketchuped their meat, and peppered their vegetables, no one added the spice of a comment on the case which had been their fare for eight days? And during those last few moments at the table, as the two alternates drained their coffee cups and pushed away the dessert plates, is it consistent with everyday experience to assume that not a word was spilled on the drama they had been witnessing, and in which to a great extent they had participated for eight days? And if there was only one reference to the case, the defendant is entitled to a new trial because the two former alternate jurors were no more entitled to speak to the twelve jurors on the case than were the waiters who served them their food.

Moreover, the granting of a new trial does not depend on proof that the two alternates actually did dis-

cuss the case with their former colleagues. It is enough to vitiate the trial that they had the *opportunity* to discuss it. In the monumental case of *Commonwealth v. Krick,* 164 Pa. Superior Ct. 516, 521, two alternate jurors went into the jury room with the other twelve and remained there ten minutes. It was argued in that case that there was no proof that the two had improperly discussed the evidence with the original twelve, but in ordering a new trial the Superior Court very fairly and courageously said: "We have no way of knowing whether the alternates deliberated with the other twelve during those ten minutes or in any way influenced their decision, but we cannot say with fair assurance that the error was harmless . . . To allow the alternates *any opportunity* to deliberate with the others after the case had been submitted was a direct violation of the Act, and constitutes reversible error." It cannot be denied and it is not denied that the alternates here had the *opportunity* to discuss the case with the original twelve. Therefore, unless the *Krick* case is overruled, which it is not, it is incomprehensible to me how the decision in this case can stand. The facts before us on this appeal are even stronger than they were in the *Krick* case since the jurors here spent at least an illegal hour with their former colleagues whereas in the *Krick* case the improper commingling was limited to ten minutes.

Under the ruling in the case of *Commonwealth ex rel. Darcy v. Claudy,* 367 Pa. 130, jurors may not be questioned as to their deliberations after the verdict has been rendered. With a cloak thus drawn over their conversations, it is as logical to assume that the alternates and jurors did the normal thing and did discuss the case at mealtime as it is to assume that they closed their minds and their mouths on the subject. Certainly it is unfair to deny attorneys the right to find out ex-

actly what happened and then conclusively hold that the alternates did not speak to the twelve on the case.

The decision of the Majority here is regrettable, not only because it confuses the picture as to when the services of alternate jurors really terminate, but it throws into shadow the matter (never heretofore questioned) as to when a case is regarded "submitted to the jury." The Act of 1935, as indicated, prohibits that alternates shall retire with the jury after the case is submitted. Since this Court now holds that the alternates may remain with the jurors even after the termination of the Court's instructions, the legal profession must assume that the Supreme Court now rules a case is not submitted to a jury at the end of the charge, but that the submission may wait until the jury has dined. And if, for any reason, the instructions end at a late hour and the dinner comes still later and the jury retires for slumber, beginning their deliberations the following morning, will it be proper for the two alternates to sleep in the dormitory with the other jurors until the next morning? And if submission of a case no longer coincides with the ending of the Court's instructions, does this now mean that the trial remains open after the Judge's charge—even to the extent that the parties may yet introduce further testimony?

Heretofore the line of demarcation between the Court's immediate jurisdiction over the jury and the jury's own autonomous deliberation was distinct. As soon as the Judge completed his charge, the jury took over. Under the decision in this case, however, the line of demarcation has dimmed and perhaps disappeared entirely. Are we to understand that there will now be an interregnum between the two jurisdictions? Is there to be an interval where the Court has lost control and the autonomy of the jury has not yet begun? And does it mean that during that twilight zone any-

one can dine with the jury, talk to the jury, or play with the jury? Is this a desirable state of affairs?

I am afraid that in a zealous determination to affirm what they regard as a proper conviction, the judges have in this case introduced a precedent which will do considerable damage to regular and accepted procedure and leave in troublesome doubt the proposition as to when alternate jurors cease being what they never were.

I believe that this Court has lost an opportunity to clarify what needs to be clarified and it has ignored a task knocking at our door for attention. By this neglect it is allowing the alternate juror system to float on an aimless sea, "each way and none."

### 2. *Political partisanship in a trial.*

During the cross-examination of a Commonwealth witness, defense counsel, for the purpose of showing bias, asked the witness if he had changed his registration from Republican to Democratic and had not gotten a job under Charles Baker, "Democratic City Commissioner," whereupon the trial assistant district attorney remarked: "He would only be a Democrat because the Democrats are in, Mr. Witkin, after 69 years of misrule." Since it was well-known that the defendant was a Republican ward leader, this reference to the Republicans being guilty of 69 years of misrule could only be prejudicial to him. The accused had the right to be tried on his own record and not on what the entire Republican Party might or might not have done in 69 years. It was not proper that he should be smitten as was Balaam's ass with faults not proved to be his own.

When defense counsel moved for the withdrawal of a juror, the motion was denied and the Court adjured the jury: "The jury will be strongly urged to ignore completely all references to Republicans and Democrats. We are here as Americans. We are not con-

cerned with the party allegiance of any of the witnesses or any of the defendants or any of the persons referred to."

This adjuration was not sufficient. The assistant district attorney should have been reprimanded for his remark which, at least for the moment, turned the trial into a political contest and away from a serious, solemn ascertainment of the truth of the charges in the indictment which, of course, made no reference to political parties.

To charge the Republicans with 69 years of misrule and suggest that the defendant, since he was a Republican, was part of that misrule, saddled upon him a burden which the Commonwealth had no right to place upon him—and the jury should have been so instructed. The most essential function of a trial judge is to keep the testimony flowing in the channel of relevancy so as to avoid disputations on issues having no bearing on the question of guilt or innocence. The assistant district attorney apologized to the Court for his remark but he did not retract it, thus allowing the charge to hang over the cliff of indecision, with the Court neither ordering it withdrawn or cutting the rope to let it fall into the abyss of harmless error.

3. *The Assistant District Attorney's remark that certain witnesses might be killed.*

In a colloquy participated in by the Court, the assistant district attorney and defense counsel, the question arose as to why a certain person, Buddy Mitchell, brought to Philadelphia from Georgia by the Commonwealth, was not called to testify. During this colloquy the following occurred: "Mr. Witkin: The purpose of offering that letter was to contradict the Commonwealth's witness that I will refer to later. The Court: It is in. Mr. Crippins: If your Honor pleases, Mr. Mitchell's name is not on any of the bills; he was not

used at the grand jury, and I can assure Mr. Witkin that there are certain other witnesses who were questioned for weeks who were not called here, again for security reasons. We can't give their names. The Court: It would be improper to produce that evidence. Mr. Crippins: They were sitting here in this courtroom and they were not called *because we want them to live after this is over*. Mr. Witkin: May it please Your Honor, Mr. Crippins has just made the statement— Mr. Crippins: He made—Mr. Witkin: I am addressing the Court. Mr. Crippins has just made the statement they have not been called because 'we want them to live after the case is over.' Mr. Crippins: That is right. Mr. Witkin: I know of no remark more prejudicial to the defendants than this one, and on behalf of Roy Dixon and also on behalf of my colleagues for their respective defendants, I again most reluctantly and unwillingly ask for the withdrawal of a juror."

Mr. Crippins' remark that certain witnesses were not called because he wanted "them to live after this is over," could only mean that if those witnesses testified they would be killed. Since the witnesses would be testifying against the various defendants on trial, of whom Roy Dixon was one, it could only be inferred that the killers would be the defendants or other killers operating in their behalf. This monstrous charge by the assistant district attorney could not possibly be cured by any instruction from the Court. Even so, as against this flagrant breach of propriety and this inexcusable imputation of conspiratorial murder, the Court merely cautioned the jury to "ignore the last few words spoken by Mr. Crippins." What were the "last few words?" At this instant an imperious duty devolved upon the Trial Judge either to declare a mistrial or to explain in easily-understood language that the Assistant District Attorney was out of order, that

the Court would protect all witnesses, and that there was no evidence that the defendant would or could do the witnesses any harm. Failing this, the Judge's words of "caution" were meaningless, and allowed the jury to believe that the defendant was indeed capable of visiting great harm, even death, on the witnesses.

It is also to be noted that when Mr. Witkin complained to the Court about Crippins' statement that "we want them to live after this is over," Mr. Crippins dogmatically reaffirmed his indefensible utterance with the remark: "That is right." This bravado could only convey to the jury that the defendant formed part of a gang capable of wiping out witnesses who dared to testify against him and his associates. There is scarcely a more serious charge that could be brought against any litigant in a court of law; and it must now remain an enigma in the State Reports how the Majority of this Court could allow so gross a dereliction to go uncorrected.

In the entire 900 printed pages of the record there is not a syllable of testimony to justify the insidious insinuation that the appellant here threatened Commonwealth witnesses. It is not enough to say, as the Commonwealth has contended, that the remarks of the prosecutor were without effect since the jury acquitted the defendant on certain counts and convicted him on others. Without the prosecutor's homicidal innuendo, the jury might have acquitted the defendant on all counts.

The prosecuting attorney is a potent figure in the arena of criminal law. Clothed with quasi-judicial power, displaying direction and control over clouds of witnesses, appearing with regularity before jurors in trial after trial, moving through the courtroom with familiarity and assurance, a charge fulminated by him in the awesome atmosphere of a legal battle takes on,

in the eyes of the jurors, the aura of authoritative fact. Especially is this true if the trial is a long one and the defendants are numerous. It is easy for the prosecutor, in such a setting, to convey the impression that in some form or another there stalks among the defendants the sinister phantom of dire deeds unrecorded and unproved, but nonetheless existent, and of which he alone, the prosecutor, is aware. Why otherwise would he hurl so grave an imputation? The jury is then further impressed when the Court merely mentions to the jury that the remarks are to be ignored. Telling the jury to ignore so weighty a denunciation is like asking them to forget they have seen the flash of a dagger, if in fact they have seen one.

As soon as the assistant district attorney charged that his witnesses travelled under the threat of assassination at the hands of the defendants, the fairness of the trial was torn asunder as lightning rips open the sky in a storm. Although the Court refused to withdraw a juror and declare a mistrial, a mistrial nonetheless followed. What ensued was no longer a trial but a mere sham and mockery. Due process disappeared, neutrality vanished, impartiality ceased to exist, and the defendant was at the mercy of invisible accusers, ominous caprice, and remorseless chance.

I dissent.

Mr. Justice BELL joins in this dissenting opinion as to the first and third grounds therein set forth.