Commonwealth *v.* Panetta, Appellant, et al.

Argued November 12, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*I. Raymond Kremer*, with him *Rush, Kremer & Maerz*, for appellant.

*Thomas M. Reed*, Assistant District Attorney, with him *Victor H. Blanc*, District Attorney, and *James N. Lafferty*, First Assistant District Attorney, for appellee.

OPINION PER CURIAM, January 7, 1957:

The judgment of sentence is affirmed on the opinion of Judge ERVIN for the Superior Court reported in 181 Pa. Superior Ct. 547, 124 A. 2d 458.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO, January 7, 1957:

Vincent Panetta, Angelo Massone, and James Crawford were indicted on charges of receiving stolen goods, accessory after the fact to larceny, and conspiracy. Panetta and Massone pleaded not guilty to all charges and asked for a jury trial. Crawford pleaded guilty to receiving stolen goods and asked to be tried by a judge without jury on the other charges. Judge KUN of the Court of Quarter Sessions of Philadelphia County, before whom the defendants appeared, decided to try all cases together and simultaneously, thus sitting as a judge with jury in the indictments against Panetta and Massone, and sitting as a judge without jury in the charges against Crawford. At the end of the Commonwealth's evidence, the Trial District Attorney moved to nolle pros the charges of conspiracy and accessory after the fact to larceny. The motion was granted, thus leaving only the charge of receiving stolen goods to be considered. The jury found Panetta and Massone guilty, and Judge KUN imposed a jail sentence against

both. He later vacated Massone's prison sentence. Panetta has appealed, seeking a new trial on two grounds: (1) that the Trial Judge's prejudicial attitude against the defendants, his excessive participation in the trial, and his argumentative charge to the jury denied the defendants the fair trial guaranteed under the Constitution; and (2) that the consolidation of a jury trial with a trial by judge alone deprived Panetta and Massone of a trial by jury as known at common law and as guaranteed by our Constitution.

## I.

A reading of the record in this case impels one reluctantly, but helpless against the facts, to the conclusion that Panetta and Massone did not receive that fair, impartial, and unprejudiced trial which is the pride and the glory of our American courts.

The Trial Judge, instead of allowing the Trial District Attorney to present his case with as much vigor as he chose, consistent with correct trial procedure, monopolized the prosecution in a manner which proclaimed to all who gave ear, or followed the proceedings with half an eye, that he was determined to ensure a conviction of the defendants at all costs. The Trial Judge probably believed the defendants guilty but so far as Panetta and Massone were concerned, it was not for him to pronounce their guilt. The Constitution leaves the determination of guilt or innocence to the jury. The fact that occasionally the Judge told the jury that upon them depended the determination of the factual issue did not purge his fault which consisted of a never-ceasing demonstration, by attitude, questions, words, sneers, sarcasm and threats, that he was in no mood to tolerate a not guilty conclusion to the contest. The man who tells a stranger that he has a choice of routes in reaching his destination and then leads him

through a labyrinth of roads and paths to the top of a cliff cannot, when the stranger falls off the cliff, exculpate himself by saying that it was not he who pushed him off the precipice. A jury, and especially a new jury, as this one was, looks to the judge for guidance and direction. If he shows by his every action that he wants the defendant convicted, why should they thwart his will when he is assuredly regarded as the fount of wisdom and the embodiment of justice? Novitiates as they are in a courtroom and overawed by the majesty of the law and its ceremonious procedure, they are only too eager to give heed to the wishes of the man who is the voice of authority, even as travelers in a foreign land will gladly trail in the wake of a native guide.

A new jury is apt also to reflect a judge's unconcealed feelings. If he scolds a lawyer before him, they can only assume that the lawyer is deserving of the censure. The Trial Judge here did not attempt to hide his displeasure with defense counsel. Although the printed record does not reproduce grimace, gesture, or intonation of voice, it would be difficult to believe that when Judge KUN made the following remarks he accompanied his harsh language with a gentle demeanor: "You are just barking up the wrong tree." "You are objecting? Very well, you are objecting and I will ask you to take your seat." "Mr. Rosenfield, we are going to do everything within our power to bring out the truth. Take your seat. You have your motion and it has been refused."

When these incidents occurred it is quite probable that Mr. Rosenfield, in making his motions, had risen to his feet out of deference and respect for the Court. In this commendable show of courtesy he was entitled to be treated like a lawyer and not as an errant schoolboy; he was entitled not to be belittled in the presence

of the jury. Every humiliation suffered by a lawyer in a court weakens his client's case, and no judge has the right to strike at an accused by crippling his defender.

A judge, of course, may ask questions during a trial. When, with a few questions, he can clarify an obscurity or untangle a seeming complication, it is his duty to intervene to the extent necessary to enlighten the jury on the issue they are to resolve. A judge is not merely a robed referee. He is to exercise command, and it is his job to maintain decorum and a dignified atmosphere in the solemn proceeding of the ascertainment of justice. However, when he asks questions, his questions should be interrogations, not fulminations or bludgeons. And he should never relinquish the sceptre of serene authority to pick up the sword of partisan attack.

The Commonwealth's case here was based on the proposition that Panetta, Massone, and Crawford had trafficked in automobile inspection stickers which they purchased from an Angelo J. DiStefano, employee in a printing establishment who had stolen the stickers from his employer. The Commonwealth called for examination a Cecil R. Gilbertson, presumably to testify that Massone, after obtaining stickers from DiStefano, sold two of them to Gilbertson. Of the questions put to Gilbertson in direct examination, some two-thirds of them came from the Judge who was obviously determined that this witness should carry forward the Commonwealth's case, even if the Judge had to lift him when he stumbled, scold him when he failed to follow a suggestion, and threaten him when he hesitated in making positive statements because he was in doubt.

It seems that several people were involved in the transaction which made Gilbertson a purchaser of stolen goods, but while he "believed" that Massone

was present at the time of the sale, he thought there was "confusion." The Judge took the questioning away from the District Attorney and when the witness stated that he knew Massone as a trucker, he asked: "Q. Did you catch up with Massone then, whom you knew as a trucker? A. I knew him as Tiny. I didn't know his name."

Here is where Judge KUN lifted the stumbling witness: "But he is one of the men there, one of the defendants, is that right?"

But with this "fingering" by the Judge, the witness still hesitated: "Yes. There is confusion about that."

But the Judge wouldn't let it remain at that and declared: "No confusion about that. How did you contact him?"

The witness went on: "I asked him if he could help me to get a sticker and he said, 'I will try. I will see'. And I think it was in the afternoon or something like that, that he came back to the bench."

Eagerly the Judge asked: "Yes?"

The witness continued: "A. And if I remember correctly, I had something in my hand that I was looking over and right there on the bench was laying the stickers. Q. And he came back to the bench? A. That is right, but he was not alone. Q. That is all right. He came back to the bench? A. He came back to the bench, yes. Q. And there was the sticker? A. Yes. Q. There had not been a sticker there before? A. No, no. Q. But when he came there, there was a sticker there? A. That is right, and there was confusion in my mind as to whether it was him or somebody else.

With alacrity the Judge decided to clear up the "confusion:" "Q. What did you do with the money? A. I laid it there and which one picked it up, I don't know, because I didn't look at that, because I was

looking at the stickers. Q. You had your mind on the stickers? A. That is where I had my mind and I didn't actually see Massone or half a dozen other guys pick it up. But it was picked up. There is no doubt about that. It wasn't there when they went out. Q. Masson came there with the stickers? A. Yes. Q. And whether— A. Whether Massone actually picked it up or somebody else picked it up from the bench, I don't recall."

Here the Judge contributed an observation all his own: "Well, it is as good one way as the other. No angel picked it up."

But excluding the angels, the jury, from the Judge's statement that it was "as good one way as the other," could believe that the Judge meant that Panetta could have been "the other."

The District Attorney attempted to cross-examine this Commonwealth witness by referring to a statement which Gilbertson had allegedly made prior to the trial. Defense counsel objected and the Judge ordered him to his seat, whereupon the Judge grasped the weapon of cross-examination himself: "Q. You said there, 'I purchased some inspection stickers from him'? A. Yes. Q. Look here at me a minute. If that is so, why all this business of ring-around-the-rosy."

The Judge was rather tired of Gilbertson's circumlocutions, so he added one of his own. But the "ring-around-the-rosy," with which the Judge charged Gilbertson was merely the witness's reluctance to be positive about something of which he was in great doubt. After all, a person's liberty was involved. He realized this if the Judge had forgotten about it.

The Judge at this juncture was quite angry with Gilbertson and his "ring-around-the-rosiness", and proceeded to show his ire: "You were asked what your

dealings with him were and you said, 'I purchased some stickers from him.' Therefore, why all this business about your laying something down and you don't know who picked it up, etc., etc.? Nobody told you what to say in the statement? A. No. Q. You could have said anything you wanted. You could have said, 'I don't know the man, I never heard of him' or anything you wanted to say, but you said, 'Yes, I purchased an inspection sticker from him.' So what is all this business about—"

The witness at this point decided to confess to the Judge his doubts in the matter: "The business is this, Your Honor, I would hate like the devil to—" .

The witness "hated like the devil" to accuse someone of whose guilt he was in a torturing doubt, but the Judge refused to let him finish the expression of this thought, and broke in with: "Never mind that."

The District Attorney resumed the questioning: "Q. Mr. Gilbertson, how many inspection stickers did you purchase from him? A. I paid— Q. How many did you purchase from him? A. Two. Q. How much did you pay him? A. $10."

But who this "him", who sold the stickers to Gilbertson was, was not specified.

The Judge re-entered the fray: "Q. No, you were asked did you know his real name? A. I do now, I would have admitted it if I knew it then. I can't lie worth a darn."

When defense counsel in cross-examination of Gilbertson asked: "You are not sure to this day if it was Massone who sold you the sticker, are you?" the Judge interjected: "You have his statement right there."

Defense counsel countered with: "Well, I have a right to cross-examine."

Here the Judge proceeded to bring the witness into line with direct threats: "THE COURT: I want to caution this witness from this point on. THE WITNESS: Yes, sir. BY THE COURT: Q. You are under oath here? A. Yes, sir. Q. You have to understand the consequences of your testimony? A. If I am lying, I go to jail, is that it? Q. I am not telling you what is liable to happen to you. But if you make a written statement like that and sign it and come into court and state something different, you may be held to account for it. Go ahead from there."

A judge has no right to tell a witness that because he made a written statement out of Court he cannot make a different statement in Court, if he believes he erred originally or if he wants to explain the statement in any way.

When defense counsel took up further cross-examination, Judge KUN sought to curtail it by saying: "He has answered your question. He said he firmly believes that Massone is the man and he so stated in writing."

But defense counsel insisted the witness answer the question: "Do you know for sure that he is the man?"

The witness, who was now thoroughly in fear as to what might happen to him if he did not answer as the Judge very obviously intended he should answer, turned to the Judge and asked: "How do you answer this?"

The Judge replied: "Answer it any way you wish."

Whereupon, the witness said: "Well, the thing is this. There is a possibility that he is not, but I think he is.".

And then, to make sure he had not aroused the Judge's wrath for not making his answer more positive, he asked the Judge: "Now, how is that?"

Thus, the questioning of this witness, which was intended to be an inquiry into truth, had degenerated from that wholesome concept into a cringing, fearsome effort on the witness's part to placate the threatening absolutist looking down at him from both his official and architectural elevation. Nor was this horrible state of affairs saved by the Judge's remark: "Don't ask me how it is. The jury will decide how it is."—especially since he added quite significantly: "I think the jury has a pretty good idea about this matter."

There can be no doubt that the jury had a pretty good idea as to what the Judge intended, what he wished them to believe, and how he expected them to decide the case.

Aside from the impropriety of the Judge's intervention, as here related, plus other gratuitous interferences which would unduly lengthen this Opinion to narrate, a serious error was committed in allowing the District Attorney to cross-examine his own witness, without pleading surprise (*Commonwealth v. Reeves*, 267 Pa. 361, *Fisher v. Hart*, 149 Pa. 232). This error alone should dictate a new trial of the case.

The harm suffered by Massone through the improper examination and cross-examination of Gilbertson was felt equally by his co-defendant, Vincent Panetta, since the whole Commonwealth's case was directed against Panetta and Massone as a unit. These two men owned and operated a used cars lot in Nicetown, Philadelphia, and it was the contention of the Commonwealth that both of them paid $60 to A. J. DiStefano for 10 packages of automobile inspection stickers which they intended to use on second hand cars, thus circumventing the need for inspection at State certified inspection stations. The charge against the two men was a serious one and when they pleaded not guilty they were en-

titled to all the safeguards thrown around accused persons by the Constitution and the law of the land.

However, when the defendant Vincent Panetta took the stand in his own defense, Judge KUN quickly let the jury know that he did not have much confidence in him. Panetta's lawyer had asked him only 6 questions when the Judge intervened and took up the questioning. Panetta had said that DiStefano had come to his lot— "he came there and he wanted to sell something or another and I chased him off that lot and threatened him not to come on the lot." The Judge quickly broke in with the disparaging remark: "Never mind about all that threatening." This excursion of the Judge into the land of sarcasm was very prejudicial to the defendant because it informed the jury at the very outset that he (the Judge) did not believe the defendant. Judge KUN then, with a cunning that could have been better employed in matching wits with a more formidable and better educated adversary, proceeded to heckle and bewilder the defendant: "Q. I see. But you said 'something or another'. Nobody sells something or another. A. Well, it was something that I had no interest in. Q. Well, you testified that he came there with something or another? A. To sell. Q. Yes. That might have been chickens or something." This remark about "chickens" could have only one effect and that was to ridicule the defendant in the eyes of the jury, and, from a reading of the record, it is indubitable that that was the effect Judge KUN intended to produce. And it was an effect which an impartial judge would not attempt to effect.

We have noted that DiStefano accused Panetta of paying him $60 for 10 packages of automobile inspection stickers. If DiStefano's testimony was correct, Panetta was guilty of receiving stolen goods. Panetta

denied that any such transaction took place. If the transaction did occur, Panetta was not telling the truth. If it did not occur, DiStefano was perverting the facts. One or the other was lying. In his spirited denial of DiStefano's testimony in this respect, Panetta said: "I chased DiStefano. I didn't even know his name at the time. The man claims he knows me 12 years. I never knew DiStefano until I got locked up by the city police. That man is an out-and-out liar." Panetta's language was censurable, but it did not deserve the vitriolic denunciation the Judge poured upon him because, in his own way, he said that DiStefano was telling lies about him. Fulminated the Judge: "It is not for you to say who is the liar. The jury will decide who is the liar. You are a defendant here and it is for you to give testimony. How dare you call another man a liar? The jury will decide who is the liar. Therefore we will strike out your comment because that is a highly improper thing for one witness to say about another." From Panetta's point of view, DiStefano *was* a liar, and while he should have been warned that he was not to characterize witnesses he did not deserve to be castigated in a manner that completely ruined his chances of an acquittal by the jury. Defense Counsel Rosenfield attempted to explain the defendant's shortcomings: "Your Honor, the witness is not a lawyer, and witnesses frequently say things—" But the Judge would not listen. He repeated: "It is stricken out. The jury will understand that they are the ones to decide who is telling the truth. It is not for this defendant who is charged with this crime to decide that." The defendant indeed was charged with crime, but he was not to be treated as if he had already been *convicted* of the crime.

In cross-examining Panetta, the District Attorney asked him if he knew DiStefano. Panetta replied:

"No, I didn't know him. I seen him but I never knew his name." Ever ready to pick up the slightest pebble of an answer and fashion it into an arrowhead of accusation, the Judge broke in: "Q. Well, then you did know him? A. I did not know him. I just seen him. Q. You just told us that you had seen him before. Knowing a person does not necessarily mean that you have to know his name. You knew that there was such a person?"

Of course, it is not necessary to point out that one may know of another person's existence without actually knowing him in the sense that everybody understands what is meant by *knowing a person*. Thus, by this querulous, cunning, and utterly inexcusable maneuver, the Judge endeavored to convey to the jury the thought that Panetta was lying because he said he did not know DiStefano. Does the Judge "know" everybody he sees on the street on his way to Court every morning?

The Court cross-examined Panetta further, asking him why DiStefano should have accused him if his story was not true. Panetta answered that DiStefano might have resented his chasing DiStefano off the lot, or that he was "trying to protect someone else who he really sold them to.".

The Judge observed: "He picked you out, but you never did anything to him." What was Panetta to do? Panetta was accused of crime and he was defending himself. If he was to do anything to DiStefano legally he would have to wait until the outcome of the trial which made him a defendant. Did the Judge mean that Panetta should have done some violence to DiStefano in order to show that he resented DiStefano's accusations?

Panetta's lawyer made motions for the withdrawal of a juror because of the Judge's show of prejudice but

in each instance the lawyer came out the loser. When Mr. Rosenfield wished to make one of these motions at side bar, the Judge refused to hear him at side bar and openly declared: "You may make a motion, but you may not make it at side bar. In the handling of a case, you have to say whatever you wish to say in open court." This almost suggested to the jury that the defense lawyer was attempting some improper influencing of the judge. When, then, Mr. Rosenfield was compelled to make his motion in open court, the Judge said, obviously for the benefit of the jury: "I cannot agree with such a statement. You have no basis for asking for the withdrawal of a juror. The purpose of a trial is to dig out the truth and that is what we are going to do here. What the truth is, the jury will have to decide." This, by way of indicating to the jury that Mr. Rosenfield was not in favor of "digging out the truth;" that "digging out the truth" was being done only by the Judge and the District Attorney.

When DiStefano was recalled by the District Attorney to rebut Panetta's statement that he had chased him off the used car lot, and he so testified, the Judge was not satisfied until he had the witness repeat that Panetta and Massone had given him $60, which was of course not a subject for rebuttal testimony at all.

With regard to the third defendant, James Crawford, DiStefano testified that he gave some stickers to him because he believed that "he could sell them and we could split the money." This caused the Judge to say: "I knew there was some money angle there somewhere. I knew it wasn't done for love and affection."

In the case of *Kane v. Kinnare*, 69 Ill. App. 81, the trial judge so interrupted witnesses and offered such gratuitous comments that the appellate court, in reversing the verdict and ordering a new trial said that

one of the greatest difficulties of the trial judge was "to keep his mouth shut." This could not properly be said of Judge KUN because, in a transcript of 90 pages, there are at least 25 pages in which he does not interrupt witnesses, insult defense counsel, intervene with gratuitous comment and prejudicial observations, and offer sanctimonious utterances that it is all for the jury while actually taking everything away from the jury.

However, although it cannot with justification be said that Judge KUN had difficulty in keeping his mouth shut, neither can it be said, with any proximity to reality, that he experienced any difficulty in getting it open.

In addition to what has been said about the Judge's flagrant bias and prejudice against the defendants throughout the trial, a glance at his charge to the jury completes the picture of an absolutely one-sided treatment which makes the attribute of impartiality in this case seem like a rare and exotic flower blooming in some distant never-never land. The speech of the District Attorney is not recorded but I do not see how it could be more of an argument for conviction than the Judge's supposed charge.

Judge KUN employed many strong words in denouncing the crime of receiving stolen goods, although I don't suppose that anyone would stand up in a courtroom and defend that crime or any crime. He also announced with much ardor of expression that the receiver of stolen goods was worse than the thief, expatiating for many paragraphs on this theme which he said was a mere "truism." Whether it is a truism or not was not the issue before the jury. The issue was whether Panetta and Massone had received stolen goods. Inflaming the jury on the heinousness of the

crime of receiving stolen goods, in the manner in which Judge KUN did it, could only suggest to the jury that he believed the two defendants guilty and that it would be intolerable to acquit them.

Undoubtedly with an eye on the appellate courts, Judge KUN informed the jury more than once that it was their function to decide the facts. A study of the record will show, however, that this assignment to the jury of the fact-finding responsibility was papier-mache'. The Judge left nothing for them to find. Alone he uncovered the culprits, single handedly he prosecuted them, and with Ciceronian emphasis he summed up the case against them. Although he sprinkled his speech with references to the jury's fact-finding function, these sprinklings were so avalanched over with heavy appeals for a verdict of guilty that, so far as protecting the rights of the accused was concerned, they were mere drops of moisture in a land of devastating aridity.

It will be recalled that Gilbertson testified (presumably) that Massone had sold him stickers. In his charge, Judge KUN told the jury several times that Massone did not deny Gilbertson's statements. This was sheer argument, and unfair argument at that, because Massone testified that he did not buy any stickers, so it was inevitable that if he did not have any of the stolen stickers he could not have sold stickers to Gilbertson. Massone's testimony was a flat denial of Gilbertson's inferences. Moreover, the burden was on the Commonwealth to prove Gilbertson's supposed accusations; and in view of Gilbertson's oft-repeated doubts as to Massone's participation in the illegal transaction, it is not clear that the Commonwealth proved that particular accusation beyond a reasonable doubt.

A detailed analysis of Judge KUN's charge would take up too much space in this already too long Opin-

ion (and there is yet a very important matter to consider), but its one-sidedness, partiality, and unjudicial character will easily become apparent from the one incident about to be related.

During the trial, defense counsel called a Joseph W. Devlin as a character witness in behalf of Massone. After Devlin testified that Massone's reputation for being a law-abiding citizen was good, the District Attorney asked him if he knew that Massone had once been arrested on a charge of indecent assault. Devlin replied that he had heard the Massone was "charged with plain assault or something like that around a few years ago." The Judge, ever ready for such an occasion, stepped in to cross-examine this witness: "Q. You are an intelligent fellow. I put the question to you plainly and you stated to the jury that the man's reputation for being a law-abiding citizen was good? A. Yes. . . . Q. So naturally the question comes up, didn't you know that he was arrested *and convicted* on a charge of assault on a minor only within the last two years? A. I heard that it was plain assault. Q. Well, whatever it was—A. Well, that is it, plain assault."*

It will be noted here that the Judge used the phrase "arrested and *convicted* on a charge of assault on a minor," a very serious charge indeed, but the District Attorney had not introduced and did not introduce any evidence of such a conviction, or any conviction. Nonetheless in charging the jury, Judge KUN said: *"That is how the Commonwealth came to bring out a record of Massone having been convicted* of some kind of an assault charge within the last two years. . . . If the good reputation of this man, Massone, *notwithstanding this conviction for this other offense* is established to

---

* Italics throughout, mine.

your satisfaction, that does not mean that he has to be acquitted—not at all."

With this kind of a positive declaration by the Judge, how could the jury come to any conclusion other than that Massone had a criminal record and that he was convicted of assault on a minor? And if Massone was so disreputable as to assault minors, would not the jury assume that Panetta could not have a good character either, since he was in business with Massone? The fact of the matter, however, is that Massone did *not* have a criminal record! Judge KUN himself finally admitted this in his opinion denying Panetta a new trial. He did not, however, have the grace to say that he had been in error and that a grave injustice had been perpetrated against Massone. He simply said: "Massone . . . had no previous criminal record." But in the meantime, Massone had been convicted, inter alia, on the statement by the Judge that he *did* have a previous criminal record. And in the meantime, also, Panetta, who, linked as he was to Massone, had to suffer the effect of every blow aimed at Massone, was also convicted. It is a simple verity that whatever was said against Massone had its adverse effect against Panetta as well. They were tied up in this trial like Siamese twins and the fact that Massone, because he escaped a prison sentence, did not appeal, does not deprive Panetta of the right to a new trial for every error committed by the Trial Judge in connection with the conviction of Massone.

It is to be remembered also that the Commonwealth had linked Panetta, Massone and Crawford together in a charge of conspiracy. The fact that the charge of conspiracy was dropped at the end of the Commonwealth's case does not alter the fact that the Commonwealth's evidence was presented on the basis of a conspiratorial plot between Panetta and Massone.

## II.

I have not mentioned the defendant James Crawford to any extent in the discussion up to this point because he is more or less the central figure in the exposition which follows. It will be remembered that when Crawford was arraigned, he pleaded not guilty to the charges of conspiracy and accessory after the fact to larceny, and he asked to be tried by a judge without a jury. Judge KUN agreed to do so but, instead of trying Crawford in a case all his own, the Judge engrafted his case to the trial of Panetta and Massone who were to be tried by a judge and jury.

Thus two trials went forward simultaneously, Judge KUN sitting in two capacities: (1) as a superintending judge over the trial by jury and (2) as a trier of fact without a jury. This procedure was an absolute nullity. A judge can no more try a case without jury while he is presiding over another one with a jury than he can play a game of cards while presiding over any legal controversy before him in court.

I am amazed that my colleagues treat so lightly a procedure which has no precedent in criminal jurisprudence, no authority in constitutional law, and no standing in the whole vast realm of orderly court procedure. The judge who presides over a jury trial in one case and at the same time sits as a judge without a jury in another case, becomes in effect two judges. Since, as a judge without a jury, he functions as a jury, he becomes a theoretical jury in himself. Thus, he really sits in three different roles: as a superintending judge in one case, as a judge in another case, and, in the same case, as a jury. Able as the presiding judge in this case assumes, with justification, himself to be, it is not in the order of things for him to perform well three separate functions concurrently.

The confusion which results from contemporaneous multiple trials is evident in this case when at the *end* of the proceedings, it was revealed that Judge KUN did not even know what Crawford was charged with. The record speaks: "MR. MINEHART: Does your Honor want to dispose of Crawford now? THE COURT: I find him not guilty of larceny. There is no evidence that he committed larceny. As a matter of fact, there was no charge of larceny pressed against the other two defendants. MR. MINEHART: That is right. THE COURT: There was no evidence presented at this trial that the defendant Crawford committed any larceny of these things. MR. SHRAGER: He is not charged with larceny. THE COURT: I thought he was."

Thus Judge KUN heard all the evidence in both cases under the totally wrong belief that Crawford was charged with larceny.

The complications which can come up through intermingling and blending of jury trials with non-jury trials are endless. What happens to the hearsay rule during this bizarre procedure? Testimony given against the non-jury defendants is strictly hearsay as against the jury defendants, and vice versa. There is no way of shutting out the hearsay testimony since it is direct evidence against the defendants to whom it applies, but meanwhile the jury is hearing it to the disadvantage of the defendants to whom it does not apply as direct evidence. Should the judge where the hearsay complication intervenes, instruct the jury to listen to it only as against one set of defendants but ignore it as against the others? And how would the jury make watertight compartments in their brains so that evidence applying against one defendant did not slosh over into the compartments reserved for considering other defendants?

In the present case DiStefano testified against Panetta and Massone. He also testified against Crawford, but Crawford, although standing trial on the conspiracy and the accessory charges, pleaded guilty to receiving stolen goods. Through this circumstance, Crawford supported DiStefano's story that he had stolen the stickers and had sold them to Panetta and Massone, but he did not take the witness stand. By failing to testify from the witness stand, he deprived Panetta and Massone of the right to cross-examine him. Under this state of affairs, what happened to the constitutional right, which belongs to every defendant, to face and question his accuser?

Nor can there be any doubt that the jury knew that Crawford had pleaded guilty to receiving stolen goods. *Judge* KUN *made an announcement to that effect in open court in the presence of the jury!*

The fact that defense counsel (not the one arguing this case on appeal) did not object to the judge sitting as a superintending judge while sitting also as a fact-finding judge, is no barrier to our considering the matter on appeal. Fundamental trial errors are always a subject for consideration by appellate courts whether or not objection is made in the court below. For instance, if a jury heard a case without first having been sworn, the appellate court would *sua sponte* declare the trial a nullity, even though no one had complained about the irregularity. In the case at bar the Judge himself should have declared at the outset that it was constitutionally impossible for him to preside over a jury trial and at the same time function as a trier of fact in another case. Where the lower Court fails to invoke the necessary remedial action when fundamental errors have occurred, it is the duty of this Court to make the correction regardless of whether or not there is exception on the record.

In the case of *Marlowe v. Travelers Ins. Co.*, 313 Pa. 430, 432, where the Trial Court affirmed a point which this Court regarded as improper, we said: "No exception was taken to the reading or affirmance of this point. We think, however, that the error of the court in reading and affirming it was so basic and fundamental . . . that *we of our own motion so recognize it.*"

In *Patterson v. Pittsburgh Rys. Co.*, 322 Pa. 125, 128, this Court said: "It is true defendant took only a general exception to the charge, but where, as here, the case calls loudly for such instructions, the failure to give them must be regarded as basic and fundamental error. Inadequacy of a charge may be taken advantage of on general exception where the instructions omitted are vital to a proper conception by the jury of the fundamental principles of law involved . . . and the inadequacy is just as basic where, in a case like the present, the legally established methods of determining the factual question involved are not explained to the jury. *Indeed in the absence of a general exception, the appellate court of its own motion may reverse because of basic and fundamental error . . .*"

In the five years that I have been on this bench, no error so basic and fundamental as this one has come before us for consideration, deliberation, and decision. That the majority of this Court should seem to be indifferent to the gravity of what has taken place is to me nothing short of shocking. Section 6 of Article I of the Pennsylvania Constitution states in the clearest language possible: "Trial by jury shall be as heretofore, and the right thereof remain inviolate."

In the case of *Commonwealth v. Fugmann*, 330 Pa. 4, 29, this Court, speaking through Mr. Chief Justice MAXEY defined common law trial jury as follows: "The essentials of a trial by jury of a defendant in a criminal case as known at the common law were: (1) a jury

composed of twelve eligible persons duly summoned, sworn and inpanelled for the trial of the issue; (2) a plea entered; (3) an ample right of challenge both for cause and peremptorily, secured to defendant; (4) a full, fair and public trial 'under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict if in his opinion it is against the law or the evidence, . . .; (5) proper and sworn testimony for the jury's consideration; (6) unanimity of the vote supporting the verdict . . . *A departure from any of these essentials would be a deprivation of 'the right to trial by jury.' "*

When a judge sits in superintendence over a jury, he cannot concurrently be sitting in another capacity. If he does so, he deprives the jury defendant of the right to trial by jury as defined not only by Chief Justice MAXEY but by every writer on common law who treats of the subject. The jury sitting in a case is entitled to the superintendency of a judge who will "instruct them on the law and advise them on the facts." In order that the judge may give this guidance and instruction properly, it is inescapable that he must devote his undivided attention to the jury trial. If, during the jury trial, he must put it behind his back in order to bestow attention on the non-jury trial, he is as much absent from the jury trial as if he had stepped out of the courtroom.

Moreover, and this is the most serious objection to such a practice, the jury can well be led astray by what the judge says and does during the time that he is functioning as a non-jury trier of facts. The only way to prevent such a straying is for the judge, as he begins his excursion into the non-jury realm to say to the jury: "Members of the jury, pay no attention to

this as I am now acting in the non-jury trial and you are not to be concerned about this feature of the proceedings." Of course, when he finishes that particular chore as a non-jury judge and returns to the business of the jury trial, he must then instruct the jury to again pick up their interest and again put on their earphones of attention, and, in order to accomplish this movement of the jury back to the main track of their responsibility, he would need to say, approximately: "Members of the jury, I am now speaking for your benefit in the jury trial." The awkwardness and gaucherie of such a performance borders on the grotesque, is disruptive of orderly progression in the development of the jury trial, and is destructive of the dignity which should accompany and attend every courtroom proceeding.

In the past, this Court guarded with jealous solicitude the sanctity of jury trials as known at common law. It is interesting, as well as illuminative, to recall that prior to the passage of the Act of June 11, 1935, P. L. 319, which authorized the waiver of jury trials in certain cases, this Court would not permit a nonjury trial even where all the parties agreed to proceed without jury. This Court held, and laudably so, that so radical a departure from trial by jury, "as heretofore," could only be authorized by the sovereign power of the State, the people, speaking through their Legislature. Thus, in the case of *Commonwealth v. Hall*, 291 Pa. 341, Chief Justice MOSCHZISKER, writing for the Court, said: "It may be that, in all criminal cases other than those involving the very highest grades of crime, it would be a wise and expedient step to permit trial by a judge alone, whenever a defendant is willing to waive his right to a jury; *but such a radical departure from customary practice involves a change in*

*public policy which is beyond the control of the judicial department to establish."*

If, therefore, this Court held, as it did, that without legislative sanction, there could be no waiver of jury trial, how can there be today, without legislative sanction, a multiple trial which embraces concomitantly a jury trial and a non-jury trial? If the courts were not permitted to waive a jury trial until the Legislature ordained the procedure, on what basis can the Courts permit a two-headed synchronized trial, before the Legislature legitimizes it?

Chief Justice MOSCHZISKER said further in the *Hall* case: "The law of Pennsylvania, as it now stands, contemplates the trial, on a plea of not guilty, of indictable offenses by a court consisting of both judge and jury; and, as ruled by the Superior Court, *the judge cannot take the place of the jury even by consent of defendant."*

Paraphrasing the above language and applying it to the case before us, we must say: The law of Pennsylvania, as it now stands, contemplates the trial, on a plea of not guilty, of indictable offenses by a court consisting of both judge and jury, unjoined to another case with the judge sitting as a judge without a jury; and, with such a limitation, the judge cannot take the place of the jury in a second concomitant trial even by consent of the defendant.

If courts may initiate so revolutionary a procedure as trying a jury trial and a non-jury trial together, there can be no limit to what they may do, and "jury trial as heretofore" could conceivably disappear entirely. Against so calamitous a tendency we should stand as firmly and as indomitably as the patriots who, in the face of fire, noose, and threatened banishment, won

for all Americans the sacred right of trial by jury, "as heretofore."

If this Court does not intend to abide by Constitutional guarantees it should say so. Its refusal to condemn the unconstitutional trial which took place in Judge KUN's courtroom is to me not only startling but it can invite a repetition of it in other courtrooms. Without wishing to seem captious and over-critical I cannot help but remark that this Court during recent years has been equally and strangely reluctant to correct other unconstitutional and illegal practices which have come before us in cases where it was charged that the defendant was denied a fair trial. For instance, in the case of *Commonwealth v. Chaitt*, 380 Pa. 532, it affirmed a conviction where the Commonwealth's evidence had been obtained through wire-tapping, in violation of Section 8, Article I of our Constitution; in the case of *Mack Appeal*, 386 Pa. 251, it affirmed a conviction of criminal contempt where the defendants, in the exercise of the right of Freedom of the Press, (Article I, Section 7), took pictures in a courthouse but not in a courtroom. In the case of *Holmes' Appeal*, 379 Pa. 599, it affirmed the commitment to a penal institution of a juvenile in a proceeding which denied him the right to be informed of the "nature and cause of the accusation against him," and of the right to meet his accusers "face to face." (Article I, Section 9). In the case of *Commonwealth ex rel. Brown v. Baldi*, 378 Pa. 504, it directed the extradition of a prisoner to another State which inflicted cruel and unusual punishment in violation of the Eighth Amendment to the Constitution of the United States. In the case of *Commonwealth v. Cannon*, 386 Pa. 62, it affirmed a conviction where the prosecution introduced in evidence a prior conviction of manslaughter, although he had been

pardoned of the offense, and in the case of *Commonwealth v. Savor*, 386 Pa. 523, it affirmed a conviction where a witness was allowed to testify to a previous penitentiary incarceration of the defendant although the defendant had introduced no character evidence, nor had he taken the stand. In the case of *Commonwealth v. Coleman*, 383 Pa. 474, it affirmed a conviction where two extra jurors, *after* they had terminated their incumbency as supplemental jurors, dined with the jury which was deciding the case.

In many of these cases, of course, the majority of the Court, moved in lines of thought which paralleled respect for law of the land, but in some instances they affirmed convictions apparently on the basis that they regarded the defendants guilty anyway. In the case of *Commonwealth v. Cannon*, supra, the Majority ended its Opinion with the statement that "the verdict rendered was obviously a just one". In the case of *Commonwealth v. Savor*, supra, it affirmed the proposition that: "Indeed, a verdict of not guilty would have been a miscarriage of justice."

But how is a verdict of guilty arrived at? Constitutionally, it can only be reached through constitutional procedure. Any deviation from the law of the land taints a resulting conviction, and nullifies the result of the jury's action.

With a decision of this kind, which makes of constitutional guarantees a matter of indifference and the fairness of trials an affair of inconsequence, the most learned of constitutional scholars could well be nonplused, the most daring of lawyers staggered, and the neophyte to the law bewildered as to how to proceed in grasping the principles which must guide him in his career ahead.

In the case of *Commonwealth v. Franklin,* 172 Pa. Superior Ct. 152, 193, the Superior Court approved of the language in a learned Opinion by Judge MILNER of the Court of Quarter Sessions of Philadelphia County, as follows: ". . . the jury is more than just a juridical instrument, it is a political institution which should not be hastily infringed upon in particular and difficult cases lest the generality of freedom which it purports to represent be undermined without planned substitute."

Judge MILNER suggests in this quotation that there may be occasion where courts are tempted to infringe upon constitutional rights because the cases are "particular" or "difficult." He properly condemns the yielding to any such temptation. One of these temptations is to affirm a conviction where it is believed the defendant is guilty anyway, so that nothing is lost in allowing the conviction to stand, despite violations of the Constitution. No reasoning could be more fallacious than that one which assumes nothing is lost by sending anyone to prison or to the gallows over the road of illegal procedure. Much is lost, and irreparably so, in condemning the most wretched criminal to a morally just doom at the expense of constitutional transgression. Once the rocky road of unconstitutional conviction is approved, it will one day jolt an innocent man to an unjust conviction and a monstrous punishment.

Furthermore, how can any tribunal be certain that the accused is guilty, if, in order to come to that conclusion it must peep through an unconstitutional keyhole? Trial by jury with all its guarantees, protections, and safeguards was not instituted in our land as a mere ceremonious spectacle, with innocence or guilt to be determined by hearsay, rumor, bias, infer-

ences, speculations, atmosphere and neighborhood feeling. It was precisely because of the prejudicial character of such reason-disturbing influences that walls of security have been built around trial by jury. Every decision which is predicated on assumptions and not on evidence, on prejudice and not on fact, on unconstitutional procedure and not on legalized form, helps to break down that wall until, unless so alarming a practice is arrested, we will no longer recognize trial by jury, the concept of which was wrapped up in every patriot's knapsack as he faced tyranny and absolutism on the numerous battlefields of our land as there was fought the war for freedom against despotic domination whether in the executive's palace or in the courtroom.